ONONDAGA COUNTY WATER AUTHORITY, Respondent, *v.* NEW YORK WATER SERVICE CORPORATION et al., Respondents. PUBLIC SERVICE COMMISSION OF THE STATE OF NEW YORK, Appellant.

Fourth Department, April 13, 1955.

*Kent H. Brown, Joseph J. Doran, George H. Kenny, Edward D. Cohen* and *Lawrence M. De Vore* for appellant.

*George W. Cregg* for Onondaga County Water Authority, respondent.

*George R. Fearon* for New York Water Service Corporation and another, respondents.

WHEELER, J. The Public Service Commission appeals from (1) the final order of the Onondaga County Court confirming the report of commissioners of appraisal appointed in a proceeding to condemn the Onondaga County properties (the Syracuse Plant) of the defendant-respondent, New York Water Service Corporation, and (2) the order of the same court denying its motion, pursuant to section 18 of the Condemnation Law, for abandonment and discontinuance of the proceeding. In an unusual alignment of interests, we have both the original parties appearing in this court as respondents in support of the award as made — $8,650,000 plus the cost of additions, betterments, and construction work in progress. The two appeals present substantially the same issues and may be considered together.

The Onondaga County Water Authority (hereinafter referred to as the " Authority ") was created by chapter 675 of the Laws of 1951 (Public Authorities Law, art. 5, tit. 6), with power to condemn any water-supply system within the territorial limits of Onondaga County in the manner provided by the Condemnation Law (Public Authorities Law, § 1129). Its corporate existence is to continue until all its bonds and liabilities have been paid or discharged, and thereupon all its rights and liabilities shall vest in the County of Onondaga (Public Authorities Law, § 1128, subd. 2).

On May 21, 1953, the Authority duly authorized the acquisition of the Syracuse plant of the defendant, New York Water Service Corporation (hereinafter variously referred to as the " Corporation ", " Owner " or " Company "). Thereafter, and having obtained the required consent of the Water Power and Control Commission, on September 28, 1954, the Authority caused its petition to be verified and this condemnation proceeding was begun. A copy of the petition with the requisite notice having been served upon the appellant, the certification required

by section 5-a of the Condemnation Law was served upon the Onondaga County Court late in November, 1954. The judgment of condemnation appointing commissioners of appraisal was entered December 2, 1954. The report of the commissioners was handed down January 3, 1955. On January 6, 1955, the order confirming the report was granted and a copy served upon the Public Service Commission. After entry of the final order, the Public Service Commission moved for the order to abandon and discontinue.

At the outset it is important to note that no party to this proceeding is challenging the judgment of condemnation. All concur that the propriety of that judgment rests solidly upon the necessity for the acquisition by the Authority. Thus, aside from some preliminary questions as to the status of the appellant in this court, the issues involved are those in regard to the amount of the award and the obligations and powers of the Public Service Commission in this proceeding to condemn the property of a public utility subject to the jurisdiction and regulations of the commission.

Fundamentally, the case is a test of the powers of the Public Service Commission under the 1952 amendments to the Condemnation Law (L. 1952, chs. 508, 515), bringing up for the first time the nature and effect of those amendments, enacting section 5-a and amending sections 14, 15 and 18. It is provided in section 5-a that a copy of the petition and notice of time and place of presentation must be served on the Public Service Commission at least thirty days prior to presentation. It then becomes the duty of the commission to certify to the court, after a hearing on notice to all parties: (1) the annual net earnings which the utility system involved might reasonably be expected to continue to produce in the hands of the condemnee; and (2) the rate base and rate of return from which that estimate is derived. This certification shall be served upon the court and the commissioners of appraisal, and they shall not determine the compensation to be made to the owners until thirty days after the required certification has been received. The amendment to section 14 provides that the commissioners shall determine the compensation with " due regard  *  *  *  to the anticipated earnings of such company as certified ". The 1952 amendments also direct service, prior to entry, of a copy of the final order confirming the report upon the Public Service Commission, and provide: " Thereafter such commission *shall be a party* to such proceedings *for all purposes* ". (Condemnation Law, § 15.) (Emphasis supplied.) In the event that the final order of con-

firmation directs payment of an amount which is (1) not a capitalization of the certified earnings of the system, or (2) in the opinion of the Public Service Commission, is so excessive or insufficient as to be not in the public interest, the commission is directed to make application to the court for the exercise of its discretionary prerogative of directing abandonment and discontinuance of the proceeding (§ 18).

In this particular proceeding, both the Authority and the Public Service Commission have meticulously conformed to the requirements of section 5-a. After being duly served with a copy of the petition and having held a prompt hearing, the Public Service Commission on November 29, 1954, made its certification pursuant to the statute. Anticipated annual net earnings were certified as $237,000, being a 6% return upon a rate base of " capital actually expended," certified to be $3,950,000 as of June 30, 1954. The commissioners of appraisal did not make their award until January 3, 1955, more than thirty days after the certification had been served upon them. The final order, upon motion of the Authority unopposed by the defendant corporation, was served upon the Public Service Commission and thereafter entered in the Onondaga County Clerk's Office. Following the entry of the final order, the Public Service Commission filed its notice of appeal therefrom.

The status of the Public Service Commission in this court is questioned by both the plaintiff and defendant. The contention is, first, that the commission is not a party to this proceeding, or, if held to be a party, it has no right to appeal from either order. We feel there is no merit in these contentions. The statute gives to the Public Service Commission something more than an absolute *right* to be a party or to intervene. In a proceeding to condemn the property of a public utility over which it has regulatory powers, the commission is made a party " for all purposes " by legislative mandate. There was, therefore, no necessity for an application to the court under section 193-b of the Civil Practice Act for permission to intervene. That procedural statute relates to a right which in the discretion of the intervenor may or may not be exercised. The language is " shall be " and not " may become " a party. (Condemnation Law, § 15.)

Nor do we agree with respondents that the Public Service Commission, even as a party, has not been vested by statute with the right to appeal. Section 19 of the Condemnation Law permits an appeal to be taken to the Appellate Division from the final order. As the statute contains no express or specific

direction as to who may appeal, it obviously follows that any party to the proceeding is vested with that right. It seems manifest that such was the legislative intent. Its mandate bringing in the Public Service Commission as a party after final order would be but a futile gesture if, as urged by the respondents, the commission could not exercise the right of appeal, its only remedy then available, and the only function a party, at that stage of the proceeding, might exercise. But section 19 is not so worded in terms of plaintiff and defendant that no one else, being a proper party, may appeal. Section 15 makes the commission a party " for all purposes ", not " for one purpose " — i.e., to move under section 18. Respondents' interpretation rewrites the statute.

Nor do we find any constitutional problems involved in the 1952 amendments. Section 5-a by no means makes it imperative for the commissioners of appraisal to adhere rigidly to the certification of the Public Service Commission, nor do the amendments contain any basis for the contention that the duties assigned to the commission tend to usurp the powers of the tribunals designated by the Constitution (art. I, § 7) as having exclusive jurisdiction in proceedings to take private property under the power of eminent domain. The legislative intention and objective in enacting these amendments has been clearly set forth in the statute. After pointing out certain instances in which it is stated that excessive awards have been made in the acquisition of private utility properties by public authorities, we find the statement: " It is therefore intended to protect the interest of the public in the property of public utility companies and the persons now or hereafter receiving service from utility companies from a recurrence of such excessive awards and, *without attempting to mandate the basis of valuation* to be followed, to direct the attention of the courts and commissioners of appraisal to the general desirability of the result derived by capitalizing the income which the private company could be expected to earn while subject to regulation as a public utility ". (L. 1952, ch. 508, § 1.) (Emphasis supplied.)

It would seem that the obvious objective of the 1952 amendments was not to cast the Public Service Commission in the character of a litigant in the ordinary sense, but, rather to require it to act in an advisory capacity and to certify the annual net earnings which might reasonably be anticipated by the present owner, as an aid to the commissioners of appraisal and the courts in proceedings for the condemnation of operating public utility systems; and also to bring the matter before the

courts for review either by appeal from the final order or by a motion to abandon under section 18, in the event that it should appear that there was a failure to give due regard to the anticipated earnings as certified by the commission. The appraisers and the courts still retain their constitutional powers to determine just compensation, entirely unimpaired by the amendments of 1952. We thus conclude the appellant Public Service Commission is a party in this proceeding and is properly before this court.

The Public Service Commission finds itself in a somewhat anomalous position. While it has been injected into the proceeding by legislative mandate as a party, it has not been afforded the opportunity of participating in the hearing before the appraisers for the purpose of offering proof of its own and cross-examining the various witnesses. Therefore, the commission, like ourselves, is bound by the record of a hearing in which it took no part and over which it had no control. The commission's motion for abandonment and discontinuance was on all the grounds, except inadequacy, set forth for such a motion in the statute (§ 18). Upon its appeal from the final order the commission contends the award of $8,650,000 plus is grossly excessive and is not supported by the evidence upon any theory of valuation; that the appraisers did not give adequate consideration to the result attained by capitalization of the earnings of the corporation as a regulated public utility, and that an erroneous principle was adopted by the appraisers in that the award was made on the basis of condemner's ability to pay rather than the value of condemnee's properties being condemned. On the contrary, the defendant-respondent owner contends that the award constitutes just compensation and was not based upon the application of any erroneous theory of valuation. The plaintiff-respondent does not present any argument in its brief for the affirmance of the final order upon the merits of the award, but joins the condemnee in the attack upon appellant's status before this court.

The valuation of utility properties in eminent domain presents unique problems. The absence of sales of similar property is one difficulty. For another thing, the taking includes not just the property but also the business, and the two are practically inseparable. "The standard of compensation in utility condemnations is an extremely vague one" (2 Orgel on Valuation under Eminent Domain, p. 66), and although many tests are considered, none seem to be controlling. No rigid measure can be prescribed for the determination of "just compensa-

tion" under all circumstances and in all cases. (*United States v. Commodities Corp.*, 339 U. S. 121.) "No hard and fast rule can be laid down that will cover every case or fix in advance the limit of the matters that may be taken into consideration by the commissioners in any particular case." (*Matter of Board of Water Supply of N. Y.*, 277 N. Y. 452, 457–458.) Various tests have been employed, alone and in combination. The usual method of fixing the value of property for taking is by ascertaining market value. But there is hardly a market, in the usual sense, for a public utility, particularly the regulated utility. We must, therefore, turn to other tests of value. What we use is largely a matter of judgment and circumstance.

Original cost is admissible in evidence, but is never controlling. This test is important in rate cases, where it nearly always is given great, if not dominant, consideration. However, by virtue of the vast distinction between the value for rate-making and the value of property for purchase or condemnation, this measure of value should not, and seldom does, carry much weight in the determination of just compensation. In short, "original cost" and "present value" are not equivalent terms.

Evidence of reproduction cost less depreciation is more widely employed as the test of value for condemnation, although by no means conclusive. (*Matter of City of New York [Blackwell's Is. Bridge]*, 198 N. Y. 84; *Kennebec Water Dist. v. City of Waterville*, 97 Me. 185.) The chief objection to this approach is that, used exclusively, it cannot value the intangible factors; it also ignores what might well be a great disparity between earnings of a utility and replacement of physical assets. Capitalization of earnings, or the "economic" value is another method of appraisal which has met with approval in some jurisdictions, although usually rejected as the sole test. (*Matter of Racine Water Co.*, 1917-D, P. U. R. 277; *Kennebec Water Dist. v. City of Waterville, supra.*) This test also has its limitations (primarily because of the speculative factors involved) but is unquestionably relevant, particularly when attempting to measure the intangibles of a public utility. "The value of property, generally speaking, is determined by its productiveness — the profits which its use brings to the owner. * * * The value, therefore, is not determined by the mere cost of construction, but more by what the completed structure brings in the way of earnings to its owner." (*Monongahela Nav. Co. v. United States*, 148 U. S. 312, 328.)

Other yardsticks of value have been offered such as the "going concern value," which sometimes includes the intangible fran-

chise. (*National Waterworks Co.* v. *Kansas City,* 62 F. 853.)
" The difference between a dead plant and a live one is a real
value ". (*Omaha* v. *Omaha Water Co.,* 218 U. S. 180, 202.)
" Going concern value " has been sometimes treated as an
additional item of value. Other considerations in reaching a
sound value are those relative to factors in each circumstance
to be considered, e.g., a franchise may be considered for what
it is worth (*Monongahela Nav. Co.* v. *United States, supra*),
or severance damages might be proper under certain circum-
stances not present here.

Regardless of the principle of valuation adopted, all of the
cases agree that " the question of just compensation is not
determined by the value to the government which takes, but
the value to the individual from which the property is taken ".
(*Monongahela Nav. Co.* v. *United States, supra; Village of St.
Johnsville* v. *Smith,* 184 N. Y. 341, 350; *Matter of New York,
Westchester & Boston Ry. Co.,* 151 App. Div. 50, 55; *United
States* v. *Miller,* 317 U. S. 369, 375.) The legislature has found
that in certain recent condemnation cases, because of inadequate
presentation, awards were made not based upon the damage
to the private owner but, contrary to law, upon the benefit to
the condemnor. (L. 1952, ch. 508.) We think that is true in
the present case. The testimony of every major witness who
testified as to evaluation is based upon erroneous principles
of evaluation and there is, in truth, little or no testimony in
the record before us upon which the value of the property could
be intelligently and correctly determined.

As the statute (L. 1952, ch. 508) which puts the Public Service
Commission in these proceedings effects that status at a point
therein when the commission cannot " litigate " nor is afforded
the opportunity to present evidence other than the certification
required by section 5-a, the only parties before the condemna-
tion commissioners are the original ones, the condemner and
the condemnee. The sole evidence of the value of the entire water
system offered by the defendant owner was the testimony of its
engineering expert, whose firm had been employed by the cor-
poration to " determine the value of its properties used and
useful in serving its customers on December 31, 1952, predicated
on cost to reproduce those properties new [less depreciation]
* * *. In addition to the appraisal of the physical facilities
which were included in the inventory, we were requested to
determine the value of the Lake Otisco water rights ".

The " Syracuse plant " of the respondent owner is a gravity
water system, delivering roughly fourteen million gallons of

water daily to approximately 8,300 residential customers and 200 commercial, industrial and public users in nine towns of Onondaga County, lying north, west and east of the City of Syracuse. The source of supply is Otisco Lake, fifteen miles southwest of Syracuse, from which the corporation is permitted by franchise to divert the water necessary to operate its distribution system. The original grant to take water was made in 1909, and allowable daily gallonage to be diverted has been increased at various intervals upon application to the Water Power and Control Commission. The physical plant and assets, both real and personal, were appraised in detail by the water company's experts. We have no quarrel with the amount reached as the reproduction cost less depreciation of the tangible assets; no evidence to the contrary was offered, and the analysis appears sound. On this basis defendant's witness (Mr. Kosters) arrives at $12,070,000 as the value of reproduction cost new less depreciation on December 31, 1952, including the value of the water rights. Adjusting that figure by taking into consideration the increases in value since that date, this witness arrives at a figure of $12,700,000 as of December 31, 1953.

By far the largest item (with the exception of the water mains) in this appraisal is $4,700,000 for the value of the water rights, the dominant intangible asset of the system. The appraisal report (Exhibit 9) indicates, and Mr. Kosters testified the figure is based '' on an estimate of the out-of-pocket cost of developing a comparable substitute source of supply on the assumption that the present rights at Lake Otisco were to be nullified and that the obligation still existed * * * to supply * * * about 14 million gallons per day, with provision for growth * * * to the authorized supply limit of 16 million gallons per day.''

We believe none of the $4,700,000 allocated for '' water rights '' may be considered. Aside from the futility of attempting to measure an intangible asset by a test specifically designed for and applicable only to the evaluation of tangibles, the appraisal of the water rights represents a considerable element of double valuation. The existing '' source of supply structures,'' e.g., the dam, intake pipes and pumping equipment, were included in the appraisal of the physical facilities, but the greater share of the cost of the '' comparable source of supply '' consists of a duplication of the same or similar structures and facilities. The projected water-supply installation also is predicated upon the increased daily gallonage which the Authority expects to deliver in the future through an expanded system. Further, a goodly

portion ($1,685,000) of the value assigned to these rights is a capitalization of increased operating costs, certainly not a proper element of *reproduction* cost. Under any analysis, the item represents merely the increased costs of construction which the Authority would be forced to bear if it were not condemning the present system. It is an appraisal of the construction cost and the capitalized excess cost of operating a purely hypothetical and not at all comparable water system, a water system diverting water from a different source of supply, with a greater capacity and with larger operational costs. The defendant's appraisers appear to have lost sight of the fact that " It is this system that is to be appraised, in its present condition and with its present efficiency.'' (*Kennebec Water Dist.* v. *City of Waterville,* 97 Me. 185, 216.)

If the $4,700,000 be excluded and the rest of the appraisal figures accepted, the result is the cost of reproduction of the existing plant (less depreciation) at an amount substantially less than the award of $8,650,000 plus additions down to transfer of title. Thus, if reproduction cost were accepted as the sole test of value, the award finds no support in the relevant evidence. These figures represent the sole appraisal offered the condemnation commissioners upon this or any other basis of evaluation, and constitute the only evidence of fair value presented by the water corporation.

The Authority, on the other hand, made no attempt to contradict the corporation's evidence, but countered with testimony purportedly evaluating the water system upon its earning power. However, the earnings upon which the final " value " rests are not those of the condemned plant, but those of the Authority's tax-free expanded water system. The Authority's witness, a member of its investment consultant, rejected reproduction cost as a measure of fair value, asserting that " The most reasonable measure of value would be based upon the earning power of the water system, that is, the *earning power of the Water Authority's property in this county.*'' (Italics supplied.) In order to reach the projected earning power, this witness accepted the estimated net revenue submitted by the Authority's engineering consultant, and assumed a forty-year bond issue at the lowest rate he deemed feasible; upon these figures he determined the maximum bond issue which the estimated revenues would support. From this he deducted certain fixed charges and came up with $8,650,000 as of December 31, 1953, as the " maximum fair value of the property to the Onondaga County Water Authority on the basis of capitalization ''.

Translated, this means, as the witness admitted, that the figure does not represent " what this property is worth, but at a figure which * * * the Onondaga Water Authority can afford to pay ". This test of value could never be accepted, let alone considered. It is based upon an erroneous principle of valuation — ability to pay, in this instance the measure of value to the condemner (*Matter of New York, Westchester & Boston Ry. Co.*, 151 App. Div. 50, 55, supra). Such criterion is *not* the value to the condemnee, but the price the condemner can afford to pay. The fallacy of this test of value is fundamental; if carried to the extreme, it would lead to ludicrous results, and could never be considered as according the condemnee its constitutional guarantee of just compensation. While such an approach to value may have its practical application in a bargain and sale situation, such a limitation cannot be forced upon the unwilling seller. Limitations, practical or otherwise, upon the availability of the wherewithal to provide " just compensation " do not constitute the measure of that compensation. Furthermore, by basing the amount of the bond issue on estimates of the Authority's earnings from an expanded system, this approach to value in effect capitalizes and confers upon the company the enormous advantage of tax-free operation.

The award is precisely the same as the estimate of the Authority's ability to pay, even to the form of the award in its disposition of the " plus " items. That might be a coincidence (*Pacific Gas & Elec. Co.* v. *Devlin,* 188 Cal. 33). We do not think so. Many factors, e.g., the prescient value alleged in the petition ($8,500,000), the emphasis of the Authority's witness that the condemner could not possibly finance any greater amount, the omission of any evidence (other than the Public Service Commission certification) regarding economic value to the owner, the very form of the award, the anomalous position upon this appeal of the primary parties, the plaintiff and defendant, particularly that of the owner (in support of an award far less than the company's alleged value), all point to the same conclusion — that the exact parallel of the award to the Authority's " valuation " is not purely coincidental.

The conclusion is not unwarranted that the commissioners have merely adopted as the amount of the award the ceiling placed by the Authority's investment counsel upon its ability to pay. If the conclusion be correct, and we feel no other inference is reasonable, the award is based upon an erroneous measure of damage and cannot be sustained. Beyond that, the award does not represent the finding of the commissioners as

to the value to the owner of the property taken. On this ground alone, the final order should be reversed.

However, there is no testimony in this record from which the value of the existing plant, in its existing condition under defendant's management, may be correctly determined. The evidence is insufficient from which a fair value could be found; the reproduction cost less depreciation appraisal, bereft of the improper item for " reproduction of water rights," would not sustain the award, and the evidence in regard to the earnings method of evaluation was practically nil. The certification of the Public Service Commission was placed in the record without comment on the last day of the hearing. The capitalization method was not explained, there was no testimony as to reasonable capitalization rates, and nothing in the record indicates the commissioners considered this test of value, except the *pro forma* allegation to that effect in their report. On this ground, too, reversal of the final award would be in order.

Furthermore, in view of the expressed legislative intent, it would seem a duty devolves upon the court to give as much effect as possible to the objective sought in the 1952 amendments to the Condemnation Law. That duty cannot be discharged by permitting the obligation imposed upon the commissioners of appraisal to be met by mere lip service in the form of a conclusory statement that " due regard " has been accorded the certified anticipated annual earnings. The legislative direction is, after all, only the statutory expression of what has long been the law — that the capitalization of earnings method is a proper consideration in arriving at the value of a regulated public utility.

That is not to say that the commissioners must accept the certified rate of return as the capitalization rate; the statute does not so direct, nor has the Public Service Commission ever taken this position. (*Matter of Western New York Water Co.*, 97 P. U. R. [N. S.] 428.) If the certified rate of return *must* be accepted as the capitalization rate, the Legislature would, in effect, be fixing original cost as the measure of value for condemnation, whereas the statute expressly disclaims any attempt to " mandate " that basis. The complete lack of similarity between the original cost used in rate-making and the " just compensation " for the purpose of taking needs no comment. The statute (§ 14) requires nothing more than that the commissioners give " due regard " to the certified *earnings*. Further, an interpretation of section 5-a as fixing the rate base as a measure of " just compensation " would at the least be

contrary to the legislative intent and at the most unconstitutional. Nevertheless, in view of the legislative intent that the capitalization of earnings test of value should be accorded some consideration by the commissioners, we deem it essential that it should appear the commissioners have not brushed aside as inconsequential the earnings certified by the Public Service Commission. It is not too much that the courts require some evidence that the will of the Legislature has been done. Nothing in the report (except the conclusory allegation) or the evidence before the commissioners indicates compliance with the statute; in fact, all the evidence points to the contrary.

Upon all three grounds, then, (1) that the award was made upon an erroneous theory of valuation, (2) that there is no evidence in the record from which the value of the property to be condemned may be correctly determined, and (3) that the record is insufficient to support the conclusion that "due regard" was accorded the anticipated earnings certified by the Public Service Commission, the final order appealed from should be reversed and the matter remitted to the same commissioners for a new appraisal. Counsel for the Public Service Commission consented upon the oral argument that, if the above order were reversed, the appeal from the order denying appellant's motion to discontinue could be dismissed as "academic." Obviously, if the matter is to be sent back to the commissioners, the proceeding cannot be dismissed. It follows, therefore, that the appeal from the order denying appellant's motion for abandonment and discontinuance of the proceeding should be dismissed.

McCurn, P. J. (dissenting). "The court's power to review the report of commissioners in condemnation proceedings is very limited. Every intendment is in favor of the action of the commission, and an award will not be set aside  *  *  * unless it is obviously wrong, or unless it is such as to shock the sense of justice of the court." (*Adirondack Power & Light Corp.* v. *Evans,* 226 App. Div. 490, 493.)

The commissioners of appraisal in this proceeding are lawyers of high caliber and integrity and they report that they have given consideration to the Public Service Commission's certification of annual earnings and rate of return, and the record does not, as I read it, contradict them in any respect. The weight to be accorded to the commission's certification in fixing value is a matter resting in the judgment of the commissioners of appraisal. The report states that they have considered all the evidence and viewed the properties. They were aware that

the Water Service Corporation had many years ago acquired the riparian rights of the owners along Nine Mile Creek and those along Otisco Lake. The opinions of the experts as to the value of such rights were advisory only. The basic question on this appeal is whether or not the award is so excessive as not to be in the public interest. The majority opinion does not state that the award is excessive. The appellants have failed to establish that the award is excessive or that it will result in any detriment to the public interest. On the contrary, the circumstances here are such that unless the award is obviously wrong the public interest demands an early conclusion of these proceedings.

I agree with the reasoning set forth in the two opinions of the County Court. I, therefore, dissent and vote for affirmance of both the final order and the order denying the Public Service Commission's motion for abandonment and discontinuance of the proceedings.

All concur, except McCurn, P. J., who dissents and votes for affirmance in a separate opinion. Present — McCurn, P. J., Vaughan, Kimball, Wheeler and Van Duser, JJ.

Final order reversed, on the law, without costs, and proceeding remitted for a new appraisal before the same commissioners. Appeal from order entered February 17, 1955, dismissed as academic.