In the Matter of the City of New York, Respondent-Appellant, Relative to Acquiring Title to Property in the Boroughs of Manhattan and Queens. Fifth Avenue Coach Lines, Inc., Appellant-Respondent. (Four Proceedings.)

In the Matter of the City of New York, Respondent-Appellant, Relative to Acquiring Title to Property in the Boroughs of Manhattan and The Bronx. Surface Transit, Inc., Appellant-Respondent. (Two Proceedings.)

First Department, July 22, 1965.

*Morris Handel* of counsel (*Milton H. Harris* and *Morris Einhorn* with him on the brief; *Leo A. Larkin, Corporation Counsel*), for respondent-appellant.

*Milton S. Gould* of counsel (*Roy M. Cohn, Michael Leschnitzer, Stephen Hochhauser, Frank S. Polestino* and *William N. Binderman* with him on the brief; *Saxe Bacon & Bolan* and *Shea Gallop Climenko & Gould,* attorneys), for appellants-respondents.

*Per Curiam.* In these consolidated condemnation proceedings appeals have been taken from the third and fourth separate and partial final decrees, by Fifth Avenue Coach Lines, Inc. and Surface Transit, Inc., respectively, and by the City of New York. We affirm in substantial reliance on the comprehensive and forward-looking opinion of Mr. Justice Hecht at Special Term.

Various and complex problems of valuation are indigenous to eminent domain proceedings, and seldom can they be resolved with mathematical precision. The judicial endeavor has been " to find working rules that will do substantial justice ", and we have been authoritatively cautioned to be " careful not to reduce the concept of ' just compensation ' to a formula " (*United States* v. *Cors,* 337 U. S. 325, 332). The caution is especially apt in the instant case, involving as it does the condemnation of two metropolitan bus transportation systems, because " valuation of utility properties in eminent domain presents unique problems " (*Onondaga County Water Auth.* v. *New York Water Serv. Corp.,* 285 App. Div. 655, 661). Special Term, it seems to us, has explored the problems before it with thoroughness and achieved an essentially fair result. We find no reason to disturb its decrees, and limit ourselves to a brief discussion of its opinion.

What, if any, compensation should be allowed for " going concern value " has proved to be the central issue.

Special Term convincingly marshalled the evidence showing the meagre earnings of the companies in recent years and, more significant, their still more dismal prospects for the future. It concluded that claimants' bus properties have not been operating profitably and are not capable of profitable operation. The finding has full support in the evidence. As to the poor historical record there can be no room for debate, and with regard to future earnings the court's analysis seems

to us irrebuttable. As it pointedly noted (46 Misc 2d 14, 21) "Sixty-eight per cent of Fifth's revenues and 62% of Surface's revenues are derived from routes which are highly competitive with the city's rapid transit system. As long as that system charges only 15 cents, it is unrealistic to expect that passengers on the competitive bus lines will pay a higher fare". And, as Special Term further noted, no findings as to future profits could be premised on claimants' wishful hope that the city would increase the fares on its own transit system. A letter from claimants to the Board of Estimate in February, 1962 confirms Special Term's gloomy prognosis. Claimants, it states, "are in a serious and critical financial condition. Petitioners in 1961 had a loss of $721,410. The loss for January of 1962 is approximately $500,000. Based upon results thus far this year, Petitioners estimate that they will have a loss in 1962, in excess of six million dollars".

The existence of the city's transit system and its fare structure and the city's long-standing fare policies are economic realities of which claimants were always well aware. They have in no sense been misled. Claimants are contending in effect that the terms of the franchises were binding only as long as their operations were profitable; and if unprofitable, the contracts became a nullity and in their place was substituted some undefined, nebulous, paternalistic obligation on the part of the city somehow to make the operations profitable. But the city never undertook to guarantee the profitability of claimants' operations, either by pumping enormous additional subsidies into their coffers or by permitting them to increase their fares, or by increasing the fares on its own transit system; and, with Special Term, we find no valid basis for determining any issue in this proceeding as if such an undertaking had been given.

There is no contention here that the city had withheld additional subsidies or refused to raise the fares on its own system for the purpose of depressing the value of claimants' properties in contemplated condemnation proceedings. It is undisputed that whether wise or unwise, statesmanlike or unstatesmanlike, the city had made a bona fide governmental and political decision to maintain its fares at a 15-cent rate. We must assume that this decision was animated by the city government's desire to serve its community best; and in that setting, of course, any holding by any court tending to disturb fundamentally such a decision would be an unwarranted usurpation of the legislative function.

The city argues that the finding that the properties have not been operating profitably and are not capable of profitable operation negatives the existence of a going concern value, and it contends that the basis of a proper award should be market value of the physical assets appraised as unconnected units of property. Special Term rejected the contention, stating that the claimants' property "must be valued as property in use; the city cannot urge that the property should be valued 'as a non-operating transit system'" (p. 26).

We are in accord with the standard thus expressed. These claimants were not yet industrial wrecks; their properties still composed viable, active transportation systems. The companies were operated as co-ordinated transit organizations, with methods, routes, records, garage and shop layouts, personnel and know-how, all reflecting the actual operating experience of several decades. Since their properties were integrated, and so functioning, they should not be appraised as though unintegrated and dismembered. They are worth something more, although to be sure, not entitled to the same increment of value they would enjoy were they operating profitably or with the capacity for future profitable operation.

A possible interpretation of *Banner Milling Co.* v. *State of New York* (240 N. Y. 533), and one strongly urged by the city, is that a going concern value may not exist in the absence of earnings or potentiality for earnings. But the implications of the opinion in that case, as in most cases presenting knotty and elusive issues, cannot be compacted that easily into one rigid and inflexible formula. *Banner* was not concerned with the unique valuation problem presented by a public utility system condemned as an entirety but which was in active though unprofitable use. Where such a system, because it is operationally viable, is seen to have an element of value not reflected in break-up market value, justice requires that this element be recognized — though it may not fit within a conventional nomenclature distilled from different fact situations. And, indeed, if Special Term has perhaps extended the frontiers of *Banner* and of other decisions dealing with going concern value, to the end of giving appropriate relief in this unique condemnation proceeding, it has done so in pursuance of the fundamental philosophy of such decisions and in our opinion justifiably.

But while we are in agreement with the general concept which Special Term has enunciated, we are divided on certain aspects of the manner of its application. Some of us believe that the trial court may have been overgenerous in evaluating

the buildings on the basis of reproduction cost new minus depreciation and in following a hybrid sound value norm as to the revenue vehicles and other personalty items. But while those Justices may entertain reservations as to the amounts of the separate valuations in such categories, they believe that the over-all awards are fair and justified under the general principles applied by Special Term, with which, as we have stated, we are in accord.

As the foregoing indicates, we are not persuaded by claimants' contention that they are entitled, in addition to the all-embracing liberal awards made by Special Term, to separate allowances for what they denominate '' going concern assets '' — such as the establishment of coach routes, operating schedules, operating systems records and procedures, training of personnel, etc. In avowedly bottoming its award on the premise that claimants' properties must be evaluated as properties '' in use,'' Special Term made ample provision for intangibles of such nature, although without specific itemization. To adopt the language of Mr. Justice CARDOZO in *Columbus Gas Co.* v. *Comm.* (292 U. S. 398, 411), they were reflected '' in the appraisal of the physical assets as part of an assembled whole.'' (Cf. *Denver Stock Yard Co.* v. *United States,* 304 U. S. 470, 479; *Matter of Yonkers R. R. Co.* v. *Maltbie,* 251 App. Div. 204, 209; 2 Orgel, Valuation under Eminent Domain [2d ed.], pp. 138–140.) The break-up or '' bare bones '' value of the physical assets, except perhaps for the real estate, would have been greatly less than the amount fixed by Special Term. Had claimants voluntarily discontinued operations and sought to sell their real estate and personalty, they would have been fortunate to realize the amount which the city on its cross appeals asserts should have been awarded — namely, two thirds of the award. A study of the record convinces us that Special Term compensated claimants very generously for all systems, programs, procedures, records, etc., established and maintained over a period of years, and important to the continuity of the operation of the bus lines.

At the same time, we must add, the utterly fantastic figures sought by claimants for '' going concern assets '' are so incredibly exaggerated that they amount to no evidence at all, and in effect resulted in a failure of proof. For that reason, and also because at best the increments for such intangibles would be quite moderate, we do not believe, even if Special Term had not made provision for them in its awards, that claimants should be given the opportunity to reopen the proceeding and introduce additional proof in this regard.

After weighing all factors, therefore, and notwithstanding the reservations some of us entertain as to the excessiveness of certain valuations, we reach the over-all conclusion that the amount fixed for each claimant at Special Term represents an equitable balance — and that the decrees under appeal accomplish the substantial justice to which the parties are entitled.

The decrees should be affirmed, without costs or disbursements to any party.

RABIN, J. (dissenting). I dissent in part and vote to remand this proceeding for further consideration in accordance with the views expressed herein.

That this proceeding encompasses much more than the mere acquisition of physical assets was recognized by the learned Judge below who stated (46 Misc 2d 14, 26): "In the case at bar, the claimants' property is being continued in the public service. Therefore it must be valued as property in use; the city cannot urge that the property should be valued 'as a non-operating transit system.'" Indeed, not only were physical assets seized, but in fact a going business was taken. This condemnation proceeding was instituted for but one purpose — to maintain the services theretofore provided by the claimants. And that purpose was fulfilled. The buses did not stop, not even momentarily. Therefore, "'The claimant is entitled to compensation, not merely for so much land, so much brick, lumber, materials and machinery considered separately, but if they had been combined, adjusted, synchronized and perfected into an efficient functioning unit of property, then it must be paid for that unit, so combined, adjusted, synchronized and perfected, as it existed at the moment of appropriation. In that limited sense, it is entitled to the 'going value' — if such a term is permissible — of its physical property.'" (*Banner Milling Co.* v. *State of New York,* 240 N. Y. 533, 544.) It is well to state now that "going value" is separate and distinct from "good will" value.

As indicated, Special Term did decide to evaluate the properties condemned as "property in use" and the majority states that "We are in accord with the standard thus expressed." I agree with that determination of Special Term and concur in the comment of the majority with respect thereto. However, Special Term, though enunciating the principle of compensating claimants for "going value" did not, in my opinion, fully hew to such principle. While, in an attempt to reflect "going value", the court appraised the

real property, buses and other personal property on the basis of a depreciated reproduction cost rather than a " break-up " market value, to my mind that does not fully reflect " going value ". And I see no reason why the valuation should be so limited. The city's only expert witness on the subject of going value — Mr. Edward A. Roberts — authored a book entitled "Fair Value, Going Value, et al. of a Bus Utility." In this work he clearly indicates that giving " reproduction cost new less depreciation " does not constitute compensation for " going value ". He calls such compensation an award for merely the " bare bones value of a business property ". I accept and agree with that statement of the city's expert.

It should be noted that Mr. Roberts did not refer to " break-up " value as being " bare bones " value. He was referring to value arrived at through the " reproduction costs new less depreciation " method as being " bare bones " value. And that is all that Special Term gave. And that is exactly what the city's expert said does *not* constitute going value.

In what manner then should claimants have been compensated to reflect such " going value "? I believe that claimants must be compensated *for everything of value taken without which continuity of service could not have been maintained.* Special Term did not award claimants such compensation. And the chief reason for my dissent is because it failed to do so. Some of the items of value taken which were necessary for the continued operation of the buses — call them tangibles or intangibles as you will — for which claimants were not compensated are: coach routes, operating systems, operating records, systems and procedures, trained personnel and layout of bus garages and shops. Nor may the city now be heard to assert that these items were not necessary to maintain continuity of service. The city did in fact condemn these items and, moreover, is making use of them. If it was of the view that these items were not necessary for the operation of the property why were they seized? And inasmuch as they were seized why should not claimants be compensated for them?

I agree with the majority that perhaps the value placed by claimants on these uncompensated properties was much too high, but that is no reason to deny them any compensation at all. However, inasmuch as the city failed to introduce evidence of the value of these properties, I would remand this proceeding to determine a fair amount to be fixed therefor.

However, it is urged that compensation for those additional items of value, so necessary for the uninterrupted and con-

tinued operation of the bus line, may not be given because it is claimed that the operation of the buses has not been a profitable one and that it is not capable of being so operated. Indeed, it has been urged that even "going value" in the limited sense adopted by Special Term may not be given for the same reason. The majority states that Special Term's finding of unprofitable operation "has full support in the evidence". I cannot agree with the majority in that respect. On the contrary, it has been established that these lines can be operated profitably. It would be unfair to judge the financial potential by merely considering one or even a few years of its operation rather than its over-all financial history of profitable operation.

And, even if a finding could be made that the operation was an unprofitable one, without a potential for profit, the city should be precluded from resting on such finding. It should not be heard to urge that full compensation should not be given for value taken because the operation is not a profitable one. It was the city that controlled the earnings of the claimants. Had the city by design depressed the earnings in order to seize the property at less than full "going value" we certainly would not permit it to accomplish such purpose. It makes little difference if we allow the city to get the benefit of such depressed earnings merely because it was not done with that design. For it was the city and the city alone that kept these earnings depressed. So far as the claimants are concerned the result is the same. In the circumstances, and considering the city's control of claimants' income, the claimants should not at the condemnor's instance be penalized for results created by the failure or the refusal of the condemnor to allow a rate that would permit of a reasonable operating profit.

Of course, this is not a rate-fixing proceeding, and I do not propose that we try to arrive at "good will" value — as distinguished from "going concern" value — by first fixing a reasonable rate and then capitalizing the net income that would have been earned had such rate been fixed. Perhaps that should be done. The city certainly had the right — whether acting fairly or not — to refuse to increase the rate of fare to a point where it becomes a reasonable one. However, it should not now be permitted to make capital of that refusal. I might add that there is no controversy at all over the fact that the city recognized that claimants were not receiving sufficient income to fairly compensate for the cost of operation. Indeed, the city tried to assist in that respect. Through no fault of the

claimants that assistance proved ineffective, but it does not detract in the slightest from the city's acknowledgment that increased income was justifiable. In the light of the foregoing, I would say it would be improper to deny these claimants what would be justly due them had they operated at a rate which would have enabled them to earn a fair and reasonable profit.

I need not, in view of the fact that this is a minority opinion, consider in depth claimants' contention that they are entitled to an award to cover their pension commitments. It may well be that such commitments are to pay for a " thing of value " of which the city is the beneficiary, having taken over not only the properties but the personnel as well.

Nor shall I discuss the valuation placed on the real or personal property, with the exception that I must observe that there is no support for the deduction of a sum in excess of $1,000,000 for what was termed functional obsolescence over and above a sum for depreciation. Of course, there is a distinction between the two, and in proper circumstances there could be a deduction for both. But I do not think that the evidence supports the propriety of a functional obsolescence deduction. Here, unlike the situation in the *Maxwell case* (15 A D 2d 153), full use was being made of the real properties by the claimants.

In the decision supporting its tentative decree, Special Term stated that it " did not consider [functional obsolescence] as a separate element of valuation." Not having so considered it, I fail to see how separate deductions should have been made for it. In any event the court did say in its decision that " It is true that there may be some duplication between the two " i.e., depreciation and functional obsolescence. There should be some evidence upon which to base a finding of depreciation as distinguished from functional obsolescence, if indeed there by any, inasmuch as the award makes a separate deduction for each.

Accordingly, I think this proceeding should be remanded for further consideration and, if necessary, for the taking of further testimony in accordance with the views hereinabove expressed.

BOTEIN, P. J., VALENTE, STEVENS and EAGER, JJ., concur in *Per Curiam* opinion; RABIN, J., dissents in opinion.

Decrees so far as appealed from affirmed, without costs and without disbursements.