William C. Hecht, Jr., J.
This trial has been brought on by five proceedings in which the City of New York condemned properties of Fifth Avenue Coach Lines, Inc. (hereafter referred to as “Fifth”) and Surface Transit, Inc. (hereafter referred to as “¡Surface”) pursuant to resolutions of the Board of Estimate of the City of New York under authority conferred by the New York State Legislature in chapter 161 of the Laws of 1962 (amdg. General City Law, § 20, subd. 2). The validity of the statute was upheld in Fifth Avenue Coach Lines v. City of New York (11 NY 2d 342).
[Matter not of general interest omitted.]
RESPECTIVE VALUATIONS OF PROPERTY TAKEN
Claimants contend that the fair value of Fifth as of the date of condemnation was $48,000,000 and that the fair value of Surface as of the same time was $44,500,000, a total of $92,500,000. The city urges that the fair value of both companies does not exceed $20,700,000.
The respective valuation figures of the tangible assets are tabulated below and are compared with the book value as of December 31, 1961, as reported by the two companies to the Public ¡Service Commission:

*17 In addition, claimants assert claims for consequential damages which they sustained by reason of the taking, in the following amounts:

RESPECTIVE CONTENTIONS OE THE PARTIES
Claimants argue that “ the difference between the value of the tangible assets above listed and the respective values of the claimants as a whole represents the value assigned by claimants’ expert witness to the fact that claimants were, when taken, going concerns performing a necessary public service cmd capable of profitable operations ” (italics supplied). This argument underlies not only the claim of approximately $9.4 millions and $14.4 millions for the alleged ‘ ‘ going concern value ” of Fifth and Surface respectively, but also claimants’ method of valuing the tangible assets.
The city recognizes the principle that ‘ ‘ The owner is to be put in as good position pecuniarily as he would have occupied if his property had not been taken ” (United States v. Miller, 317 U. S. 369, 373). Its argument is: “ Inasmuch as claimants had no capacity for profitable operations, exchange value of the property, as a non-operatmg transit system ($20,700,000), places claimants in the pecuniary position they would have occupied had their property not been taken, and represents the highest measure of just compensation” (italics supplied). That argument underlies the city’s contention that no allowánce should be made for going concern value and also accounts for the city’s method of valuing the tangible assets.
After a complete review of the evidence and study of the able and comprehensive briefs submitted by both sides, the court is unable to accept the italicized portions of either of the foregoing arguments. In view of the vigor with which they were presented, the large amounts involved, and the wide disparity in the valuations (caused in large part by these funda *18 mental differences in the respective legal philosophies), it was deemed desirable to have both sides put in all of their proof. This should avoid the necessity for a retrial if the appellate courts disagree with any of my conclusions.
The trial took over a ygar. The transcript comes to 20,752 pages. There are 981 exhibits, many of them quite voluminous.
DEFINITION OF TERMS
It is necessary at the outset to define the term “ going-concern value ” as it will be used in this opinion, in order to avoid semantic pitfalls. ‘ ‘ Going-concern value ” # * * is a portmanteau phrase that needs unpacking ” (Kimball Laundry Co. v. United States, 338 U. S. 1, 9), particularly since it represents the crux of the divergence of valuations here.
“ That there is an element of value in an assembled and established plant, [a] doing business and [b] earning money, over one not thus advanced, is self-evident.” (Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 165; italics and [a] and [b] supplied.) But items [a] and [b] must be kept separate and distinct.
“Apparently some confusion has arisen in the use of the words ‘ going concern value ’ and ‘ good will. ’ In its brief the appellant at times uses these words interchangeably. In dealing with the subject of good will the reports and text books use the words 1 going concern value, ’ and the one generally includes the other to some extent. In considering the present point made by the appellant we must be careful to exclude the ‘ good will ’ meaning of the words ‘ going concern value’” (Banner Milling Co. v. State of New York, 240 N. Y. 533, 543).
‘ ‘ good will ’ ’
The “ good will” meaning of the words “going concern value ” in Banner (supra) referred to the earnings of claimant (240 N. Y. 533, 539).
“ There is no more important element in the valuation of commercial properties than earnings ” (Ecker v. Western Pacific R. R. Co., 318 U. S. 448, 483). “ One index of going-concern value offered by petitioner is the record of its past earnings. If they should be found to have been unusually high in proportion to investment in its physical property, that might have been a persuasive indication to an informed purchaser of the business that more than tangible factors were at work ” (Kimball Laundry Co. v. United States, 338 U. S. 1, 16; footnote omitted).
*19 For 1961, Fifth had a deficit of $300,000 after taxes, and Surface had a net income of $90,000 after taxes. For the last three years, the average net income after taxes was $27,000 for Fifth and $552,000 for 'Surface.
The average net operating income for the last ten years for the two companies combined was $3.2 millions. Since this figure is before income taxes and other adjustments (which were not stated in the exhibits), the average net income for the period for both companies would be substantially less.
“ It is usually said that market value is what a willing buyer would pay in cash to a willing seller ” (United States v. Miller, 317 U. S. 369, 374, supra). Obviously, no willing buyer would pay $92.5 millions for an enterprise with such an earnings history.
In an effort to escape from this inexorable fact, claimants contend that they are “ capable of profitable operation,” and their entire valuation structure rests on this foundation. In describing their proof, claimants argue that “ the principle is the same as that applied in other areas of the law where the fact of damage is certain but the amount of compensation is in doubt [where] the courts have held that1 reasonable conjectures and probable estimates must be resorted to and the trier of the facts * * * must make the best approximation possible through the exercise of good sense and judgment. ’ ”
This argument is untenable. The cases relied on by claimants involved breach of contract, where the wrongdoer may not require “ 1 any higher degree of certainty in respect to the amount of damages than in respect to any other branch óf a cause ’ ” (Duane Jones Co. v. Burke, 306 N. Y. 172, 192). As was held in the leading case of Wakeman v. Wheeler & Wilson Mfg. Co. (101 N. Y. 205) and in numerous other cases since then, “where it is certain damages have been caused by a wrong and the only uncertainty is as to the amount, there can rarely be good reason for refusing, on account of such uncertainty, any damages whatever for the wrong” (Alexander’s Dept. Stores v. Ohrbach’s, Inc., 269 App. Div. 321, 328; italics supplied).
But here the city has not committed any wrong. It has exercised the sovereign prerogative of eminent domain which was conferred upon it by the Legislature for ‘£ the protection of the public health, welfare and safety” (L. 1962, ch. 161, § 1).
As was said by Dye, J., in upholding the constitutionality of the statute (Fifth Ave. Coach Lines v. City of New York, 11 N Y 2d 342, 346-347, 349):
*20 ‘‘ Section 20 of the General City Law (as amd. by L. 1962, ch. 161, eft. March 19, 1962) authorizes a city with a population of one million or more inhabitants to acquire by condemnation any property and the franchises of any person, firm or corporation situated within such city used and usable in the operation of omnibus lines which are entirely within and do not extend beyond the boundaries of such cities, the immediate acquisition of which property and franchises is determined by the Board of Estimate or other appropriate governing body of such city to be necessary to serve the public convenience through the provision of adequate omnibus transportation, notwithstanding the fact that such property and franchises were or are devoted to a public use. In so doing, the Legislature declared that * the continued uninterrupted adequate, efficient and safe operation of omnibus lines [in such cities] is essential to the health, welfare and safety of the inhabitants of such cities [and that the provisions of the statute as enacted] relate to the protection of the public health, welfare and safety and are for a public purpose ’ (§ 1).
* # #
‘ ‘ Although it is clear that the question of whether a taking is for a public use is a judicial one (see, e.g., Denihan Enterprises v. O’Dwyer, 302 N. Y. 451; Matter of Townsend, 39 N. Y. 171; Rindge Co. v. Los Angeles County, 262 U. S. 700), it is equally clear that the taking over by government of the property of a public service corporation for the purpose of providing the same service under governmental, as opposed to private, auspices is a public use (Long Is. Water Supply Co. v. Brooklyn, 166 U. S. 685, affg. 143 N. Y. 596; West Riv. Bridge Co. v. Dix, 6 How. [47 U. S.] 507).” (Italics in original.)
In these condemnation cases, the courts may not make awards on the basis of such speculative conjectures or estimates as are made by claimants.
‘1 Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable, should be excluded from consideration, for that would be to allow mere speculation and conjecture to become a guide for the ascertainment of value — a thing to be condemned in business transactions as well as in judicial ascertainment of truth ” (Olson v. United States, 292 U. S. 246, 257, per Butler, J.).
“ The actual experience of the Company is more convincing than tabulations of estimates. * * * Elaborate calculations which are at war with realities are of no avail ’ ’ (Lindheimer v. Illinois Tel. Co., 292 U. S. 151, 163-164, per Hughes, Ch. J.). *21 u The predictions must meet the controlling test of experience ” (ibid., p. 170). (See, also, discussion in Matter of City of N. Y. [.Lincoln Sq. Proj.], 22 Misc 2d 619, 625-626, 23 Misc 2d 690, 695; 15 A D 2d 650, mot. for lv. to app. den. 11 N Y 2d 646.)
While the rejection of claimants’ contention could rest on their complete failure to sustain their burden of proof, it may be added that the evidence convincingly demonstrates that claimants are not capable of profitable operation.
■Claimants argue first that by rearrangement of routes and elimination of personnel, they could achieve substantial operating economies. If this could have been done without involving labor troubles which precluded service, one wonders why it was not done many years ago.
Claimants’ basic contention is that they have a heavy density of passenger traffic, but have not been able to operate profitably because their fare has consistently been restricted to an inadequate figure; and that the present 15-cent fare is inadequate, especially when compared with the 20-cent and 25-cent fares prevailing in most other large cities. Their argument is that they have a constitutional and statutory right to a compensatory fare, and that if such compensatory fare were in effect, they could operate profitably.
The complete answer is that, during the entire 10-year period while claimants’ earnings before income taxes averaged only about $3.2 millions on a business alleged to be worth $92.5 millions, they had whatever right they now contend for, yet they failed to assert it. This must have been because they recognized that they could not overcome the practical or legal obstacles, or both. They have not shown any greater chance of success at this time.
The practical obstacle was and continues to be insuperable. Sixty-eight per cent of Fifth’s revenues and 62% of Surface’s revenues are derived from routes which are highly competitive with the city’s rapid transit system. As long as that system charges only 15 cents, it is unrealistic to expect that passengers on the competitive bus lines will pay a higher fare.
Claimants introduced testimony to the effect that the city would have to increase the fare on its own rapid transit system. This testimony was nothing more than the wishful thinking of claimants ’ witness. A condemnation award cannot be predicated on such a surmise.
The legal obstacle to a higher fare seems equally insuperable. In view of their franchise agreement to charge no more than 15 cents, claimants have no constitutional right to a higher fare. (Public Service Comm. v. Westchester St. R. R. Co., 206 N. Y, *22 209, 220-221; Texarkana v. Arkansas Gas Co., 306 U. S. 188, 204.)
As to their claimed statutory right, claimants point out that, prior to the transfer of authority over bus fares from the Public Service Commission to the City of New York by section 5-d of the Public Service Law; article 3-A of that statute gave the commission power to increase rates even though they were fixed by franchise contracts (People ex rel. City of New York v. Nixon, 229 N. Y. 356). They contend that since they accepted their franchises while that power was vested in the commission, the transfer of regulatory power merely changed the tribunal; it did not relieve the city, as the new regulatory authority, from the obligation to permit a compensatory fare without regard to the franchise restrictions. The city contends that the present statute authorizes it to enforce the franchise agreement as to fares.
■ It is unnecessary to examine the- many cases on this problem, since' “ The rule governing the authority - of the' Public Service Commission to abrogate franchise contracts between municipalities and public utilities, as appears from the Opinions and judgments in several still approved cases, might seem to lack the clarity of the rule in Shelley’s case ” (Hill; P. J., in Matter of Queens-Nassau Tr. Lines v. Maltbie, 271 App. Div. 81, 84-85, affd. 296 N. Y. 893, 901). We will assume arguendo that claimants'’ interpretation is correct. '
At most, that would mean that claimants would be entitled to a compensatory fare as long as they were required to operate (People ex rel. City of New York v. Nixon, supra, pp. 358-359). The rationale of Nixon was that, by^ enactment of the Public Service Commission Law (now the Public Service Law), the Legislature had initiated a new public policy; “ rates were thereafter to be just and reasonable alike for carriers on the one side and for passengers or shippers on the other.”
But the Legislature never declared, and Nixon (supra) does not hold, that the city is required to allow claimants to continúe operations when the latter are unwilling to adhere to the fare fixed in the franchise. On the contrary, the Legislature specifically authorized the city “ to acquire by condemnation any property and the franchises ” of any omnibus corporation, “ the immediate acquisition of which property and franchises is determined by the board of estimate * * * to be necessary to serve the public convenience through the provision of adequate omnibus transportation” (L. 1962, ch. 161, supra).
This grant of power must be read in the context of well-established condemnation law, that the amount to be paid to *23 the condemnee is the. value of its property on the date of condemnation. To the extent that the condemnee’s earnings are material to that determination, it is the earnings on that date.
The Legislature was certainly. familiar with this well-established principle when it enacted chapter 161 of the Laws of 1962. It would be anomalous to torture out of that statute a mandate that the condemnee’s property should be valued on the hypothetical prospect as to what its earnings might be if it were forced to continue operations, and by-virtue of such compulsion the city would be required to allow the claimants a higher fare.
This is particularly true because the Legislature enacted the instant condemnation statute on the basis of its findings and declaration that u the continued uninterrupted adequate, efficient and safe operation ” of claimants’ omnibus lines “ is essential to the health, welfare and safety of the inhabitants ” of the city. “ Adequate ” operation embodies the concept of a fare within the means of those using the facilities. And the Legislature has. shown itself conscious of and sympathetic to the city’s effort to preserve the present fare structure (see L. 1964, ch. 513). It would be .flying in the face of the clearly indicated legislative purpose in the enactment of the two foregoing statutes, to hold that claimants may require the city either to allow them to continue operations at a higher fare, or to pay for their properties a price computed on the basis of such hypothetical higher fare. — when the very payment of such price might necessitate an increase in fare, which was one of the things the condemnation was designed to avoid.
The city has condemned claimants’ bus lines for a public purpose authorized and approved by the Legislature. It would be unconscionable to compel the city, under such circumstances, to pay $92.5 millions for properties having a book value of ’ $18.6 millions, when the enterprise has not earned an adequate return even on this book value and has not shown itself capable of profitable operation in the past or in the future.
There is another compelling reason why claimants’ contention must be rejected.. Even if we accept their argument that section 5-d of the Public Service Law imposes on the city : the same obligation as section 63-b imposed on the Public Service Commission, that does not establish the value sought by claimants.
In fixing rates under section 63-b, the commission 1 ‘ may consider all facts which in its judgment have any bearing upon a proper determination of the question * * • * with due *24 regard among other things to a reasonable average return upon capital actually expended ” (italics supplied). This vital distinction between the foregoing basis of rates for omnibus companies (which applies also to gas and electric, steam, and waterworks corporations) and railroad and telephone rates, which are based “upon the value of the property actually used in the public service ”, was pointed out by Judge Froessel in Matter of New York Tel. Co. v. Public Serv. Comm. (309 N. Y. 569, 577; see application of this principle to electric rates in Matter of City of N. Y. v. Public Serv. Comm., 17 A D 2d 581, 584, mot. for lv. to app. den. 13 N Y 2d 594).
Therefore, if claimants’ interpretation of section 5-d is correct, the city would be fully discharging its duty if it fixed a fare which would show an adequate return on the $8.1 millions of capital actually expended by Fifth, and the $10.8 millions of capital actually expended by Surface. Such a fare would not justify the valuation sought by claimants.
It is true that book value is not the limit of value in condemnation cases (Onondaga Co. Water Auth. v. New York Water Serv. Corp., 285 App. Div. 655, 662). If claimants’ land has appreciated, they will get the benefit of that increase. If the market value of the buildings and buses to a willing buyer wishing to continue the bus operation exceeds their book value, claimants will get that excess.
Claimants will receive the fair value which a willing buyer would pay for the land, garages, buses and equipment being used by a going bus operation with a meager earnings record. The evidence establishes that the foregoing possible increases in value do not justify the valuation sought by claimants, in the absence of a tremendous allowance for good will, which they have not proved.
In Matter of City of New York (Sixth Ave. El. R. R.) (265 App. Div. 200), relied on by claimants, the Sixth Avenue Elevated, which had been condemned, had been operated as an integral part of the Manhattan Railway System. There was no proof at all as to what its income would have been if severed from the remainder of the system. The court remanded for the purpose of taking such proof, holding that “ The first essential question to be determined in fixing the value of property taken under such circumstances is to ascertain whether the railroad was capable of profitable operation. * * * If the court should determine that the Sixth Avenue Line was capable of profitable operation, then some fair measure of the value of the railroad as a going concern would have to be applied ” (pp. 205-206).
*25 In the instant case, volumes of testimony have been taken on this subject, and the court has concluded that claimants have not established that they are capable of profitable operation. YVhere this finding is made, no allowance is given for good will (Matter of City of New York [Manhattan Ry. Co.], 265 N. Y. 170, 182). As was said by Cardozo, J., in affirming that decision: 11 Substantial prices are not paid for the privilege of conducting a business at a loss” (Roberts v. New York City, 295 U. S. 264, 282).
Claimants offered testimony as to the “ ratio of going concern value to gross revenues as shown by sales of other metropolitan transit systems to public agencies ”, inasmuch as “ public agencies have become the dominant class of purchasers of urban transit lines ’ ’. Their witness argued that these sales were relevant because their “ average asset mix” was similar to that of claimants.
Net earnings, rather than gross revenues, constitute the measure of value. Moreover, ‘ ‘ the law is well settled that market value can only be established by sales of other property in the vicinity which is similar to the property taken ’ ’ (St. Agnes Cemetery v. State of New York, 3 N Y 2d 37, 44 [italics in original]; see, also, Matter of City of N. Y. [2460 Jerome Ave. Realty Corp.], 18 A D 2d 991; United States v. Toronto Nav. Co., 338 U. S. 396, 406-407). I can see no similarity between claimants’ bus operations in Manhattan and the Bronx and bus operations in other cities “ having an average asset mix,” — especially since almost every other major municipal system operated at basic fares ranging from 20 cents to 30 cents, compared to the 15 cents’ fare charged by claimants, and since claimants’ witness disclaimed any effort “ to undertake a detailed analysis of the assets involved in each of these transfers, ’ ’ or of the equipment and operations of any of the bus companies sold.
“ GOING CONCERN VALUE ”
“ The claimant is entitled to compensation, not merely for so much land, so much brick, lumber, materials and machinery considered separately, but if they have been combined, adjusted, synchronized and perfected into an efficient functioning unit of property, then it must be paid for that unit, so combined, adjusted, synchronized and perfected, as it existed at the moment of appropriation. In that limited sense, it is entitled to the ‘ going value ’ — if such a term is permissible — of its physical property ” (Banner Milling Co. v. State of New York, 240 N. Y. 533, 544). “It is now generally recognized that *26 ‘ going value ’, as distinct from ‘ good will is to be considered in valuing the property of a public service corporation either for the purpose of condemnation or rate making. ’ ’ (People ex rel. Kings County L. Co. v. Willcox, 210 N. Y. 479, 484.)
“ In this situation, there can be no' question of the company’s right to adequate compensation- for the use of its property employed, and necessarily employed, in the public service; nor can it be doubted that the property must be valued as prop-' erty in use. It involves a practical contradiction in terms to say that property useful and actually used in a public service is not to be estimated as having the value of property in Use, but is to be reckoned with on the basis of its ‘ junk value ’ ” (Denver v. Denver Union Water Co.] 246 U. S. 178, 190-191). The condemnation here ‘ ‘ did not limit the value to the' bare bones of the plant * * *. The difference between á dead plant and a live one is a real value ” (Omaha v. Omaha Water Co., 218 U. S. 180, 202).
In the case at bar, the claimants’ property is being continued in the public service. Therefore it must be valued ás property in use; the city cannot urge that the property should be valued “as a non-operating transit system.” However, this’ does not justify the separate and additional valuation sought by claimants for the following items :

This is claimants’ alternative method of arriving at the overall claim of $48,000,000 for Fifth and $44,500,000 for Surface, in the event that the court does not accept claimants’ argument (supra), that their capacity for profitable operation justifies this increase for “good will” in the.valuation of their tangible assets ($38,646,000 for Fifth and $30,106,000 for Surface),
No allowance may be made for Surface’s operating rights and permits nor for Fifth’s perpetual franchises for the reasons already, stated in the discussion of the Nixon case. The other items are not supported by the cases urged by claimants.
Banner Milling Co. v. State of New York (240 N. Y. 533, supra), the case which recognized the principle that allowance must be made for “ going value ” in' a condemnation proceed *27 ing, specifically held that- a separate valuation was not required to compensate for the expenses involved “in building up and constructing the mill as a going concern, efficient and appropriate for the business,” so long as claimant was allowed the full value of the tangible assets, viewed as a going concern. The court said (pp. 544-545):
‘ ‘ The point which the appellant now makes is that the findings show that the court in arriving at its conclusions failed to follow this rule. I do not think so.
“ At the request of the claimant the court found as follows:
“ ‘ 32. That the fair value of architect’s and engineer’s fees upon the construction and equipment of said plant, insurance premiums and interest on investment during construction period, railway franchises, legal expenses, sundry items correcting errors in construction,-expenses incurred in operating mill at a.loss up to timé when machinery is synchronized and coordinated so as to . produce' satisfactory results is the sum of Seventy-five Thousand Dollars ($75,000.00).’ It refused to find that the claimant was entitled to this figure. Its action is important so I shall quote the finding which was refused.
“ ‘ 5. That claimant is entitled to.recover from the State of New. York the-.sum of Seventy-five Thousand Dollars the fair and reasonable sound value of the architect’s and engineering fees, taxes, interest and insurance covering the period of construction, legal fees, franchises and losses incurred during period of “ tuning up,”, synchronizing and co-ordinating plant so as to - reach normal efficiency, taken and destroyed by the State in the taking of physical property on the 7th of April, 1917.
“ ‘ Refused. ’
“ Nowhere does it appear, however, that all these elements making up this $75,000 expense’ were not considered by the court in arriving at its total figure of valuation. What elements it considered or excluded is not stated. As I have said, the claimant was not entitled as a matter of law to recover these expenses-, it was entitled to have them considered as necessary in building up and constructing the mill as a going concern, efficient and appropriate for the business.’’ (Italics supplied.)
See, also, Des Moines Gas Co. v. Des Moines (238 U. S. 153, 171, supra).
Kimball Laundry Co. v. United States (338 U. S. 1, supra), the authority most strongly urged by claimants, must be read with caution. Mr. Justice Frankfurter, who wrote the opinion of the court for four Justices, emphasized that the case involved a temporary, and not a permanent taking. ‘ ‘ The *28 temporary interruption as opposed to the final severance of occupancy so greatly narrows the range of alternatives open to the condemnee that it substantially increases the condemnor’s obligation to him. It is a difference in degree wide enough to require a difference in result ” (p. 15). Four Justices dissented, and Mr. Justice Rutledge concurred in the result solely on the ground ‘ ‘ that short-term takings of property entail considerations not present where complete title has been taken ’ ’ (pp. 21-22).
However, even on the assumption that the Kimball principles would apply to a fee taking, it does not help claimants here. There the holding was that ‘ ‘ there should have been included in the award to [claimant] some allowance for diminution in the value of its business due to the destruction of its ‘ trade routes. ’ The term ‘ trade routes ’ serves as a general designation both for the lists of customers built up by solicitation over the years and for the continued hold of the Laundry upon their patronage” (p. 8). The rationale of the court was thus expressed (pp. 9-10):
“ Since petitioner has been fully compensated for the value of its physical property, any separate value that its trade routes may have must therefore result from the contribution to the earning capacity of the business of greater skill in management and more effective solicitation of patronage than are commonly given to such a combination of land, plant, and equipment. The product of such contributions is an intangible which may be compendiously designated as ‘ going-concern value, ’ but this is a portmanteau phrase that needs unpacking.
“ Though compounded of many factors in addition to relations with customers, that element of going-concern value which is contributed by superior management may be transferable to the extent that it has a momentum likely to be felt even after a new owner and new management have succeeded to the business property. But because this momentum can be maintained only by the application of continued energy and skill, it would gradually spend itself if the effort and skill of the new management were not in its turn expended. See Patón, Advanced Accounting 427, 435 (1941). Only that exercise of managerial efficiency, however, which has contributed to the future profitability of the business will have a transferable momentum that may give it value to a potential purchaser; that which has had only the effect of increasing current income or reducing expenses of operation has spent itself from year to year.” (Italics supplied.)
*29 Claimants here have not shown any “ contribution to the earning capacity of the business of greater skill in management and more effective solicitation of patronage than are commonly given to such a combination of land, plant, and equipment.” On the contrary, their testimony of expenditures for training personnel, for mapping out coach routes, for developing operating systems and schedules, and for laying out garages, at most, would have “ only the effect of increasing current income or reducing expenses of operation ’ ’.
There is a vast difference between money spent in developing patronage in a competitive business, and the expenditures which claimants seek to make a basis for valuation here. An established following in a competitive business is an asset of value for which a buyer will pay, but “ That kind of good will * * * is of little or no commercial value when the
business is, as here, a natural monopoly, with which the customer must deal, whether he will or no ” (Omaha v. Omaha Water Co., 218 U. S. 180, 202, supra).
Nor would buyers ordinarily pay anything for the seller’s expenditures in developing a trained labor force or for the other costs claimed here, especially where the end result of those expenditures fails to produce a profit. To repeat Justice Cabdozo’s language: “ Substantial prices are not paid for the privilege of conducting a business at a loss ” (Roberts v. New York City, 295 U. S. 264, 282, supra).
Claimants cite my decision [in this case] denying the city’s motion to quash their subpoena duces tecum, wherein I said:
‘ ‘ Claimants seek evidence to show that the city has continued the use of their trained and experienced personnel and of their tested operating routes and schedules. If this be established, and if it be shown that it would have cost the city substantial sums to hire and train its own personnel, and to work out its operating routes and schedules, and that the city obtained the benefit of claimants’ investment in thus building up a going business which the city was able to take over and operate without interruption, that might be an element of going concern value.” (N. Y. L. J., Feb. 18,1963, p. 15, col. 3; italics supplied.)
That ruling was made in accordance with the policy described above of admitting all testimony which might be deemed relevant, in order to make a complete record. Study of the cases satisfies me that the expenses referred to are not an element of going concern value in this case.
In People ex rel. Kings County L. Co. v. Willcox (210 N. Y. 479, supra), another case relied on by claimants, the court said: “ [The utility] would have been entitled to a return on the valu *30 ation adopted by the commission, if it had no customers, but was just ready to begin business, whereas it had a plant in operation with an established business which every one knows takes time, labor and money to build up ” (p. 485).
That was a rate case, not a condemnation case. Although at the outset of his opinion, Judge Miller, indicated that “ ‘ going value ’ * # * is to be considered in valuing the property of a public service corporation either for the purpose of condemnation or rate making” (p. 484), this is qualified in the subsequent portions.. Thus, he says (pp. 488-489): “It may be, as is urged, that a well-conducted enterprise will charge the cost of developing the business to operating expenses, and that it would open the door to an overissue of securities to permit the capitalization of early losses. In answer, it is sufficient to say that we are dealing, not with proper methods of bookkeeping, not with the proper capitalization upon which to issue securities, but solely with the fair return which the company is entitled to receive from the public. Treating a reasonably necessary and proper outlay in building up a business as an investment for the purpose of determining the fair rate of return to be charged is far from holding that it should be treated as capital against which securities might be issued ” (italics supplied).
If such an outlay may not ‘ ‘ be treated as capital against which securities might be issued ’ ’, there is substantial doubt as to whether it may be treated as a component of value- in condemnation. Even in that context, while the court made reference to correction of mistakes in construction, making experiments which sometimes turn out to be useless, and perfecting an organization (p. 486), it concluded by saying (p. 487): “ By the expenditure of time, labor and money, it co-ordinates those bones into an efficient working organism and acquires a paying business ” (italics supplied).
That case thus repeats the concept expressed in the Des Mmnes Gas case (238 U. S. 153, supra) and the other Federal cases, that the expenditures to which it is sought to assign a.value must have resulted in earning money.
In Omaha v. Omaha Water Co. (supra), a condemnation case cited with approval in Willcox (supra), the court said, per Lurtoít, J. (218 U. S. 180, 202-203): “ The option to purchase excluded any value on account of unexpired franchise; but it did not limit the value to the bare bones of the plant, its physical properties, such as its lands, its machinery, its water pipes or settling reservoirs, nor to what it would take to reproduce each of its physical features. The value in equity and justice *31 must include whatever is contributed by the fact of the connection of the items making a complete and operating plant. The difference between a dead plant and a live one is a real value, and is independent of any franchise to go on, or any mere good will as between such a plant and its customers. * * *
That there is a difference between even the cost of duplication, less depreciation, of the elements making up the water company plant, and the commercial value of the business as a going concern, is evident. Such an allowance was upheld in National Waterworks v. Kansas City, 62 Fed. Rep. 853, where the opinion was by Mr. Justice Brewer. We can add nothing to the reasoning of the learned Justice, and shall not try to.” In National Waterworks Co. v. Kansas City (62 F. 853) Mr. Justice Brewer, speaking as the Circuit Justice for the Eighth Circuit, said (p. 865): “Nor would the mere cost of reproducing the waterworks plant be a fair test, because that does not take into account the value which flows from the established connections between the pipes and the buildings of the city. It is obvious that the mere cost of purchasing the land, constructing the buildings, putting in the machinery, and laying the pipes in the streets — in other words, the cost of reproduction — does not give the value of the property as it is today. A completed system of water works, such as the company has, without a single connection between the pipes in the streets and the buildings of the city, would be a property of much less value than that system connected, as it is, with so many buildings, and earning, in consequence thereof, the money which it does earn. The fact that it is a system in operation, not only with a capacity to supply the city, but actually supplying many buildings in the city,— not only with a capacity to earn, hut actually earning, — makes it true that ‘ the fair and equitable value ’ is something in excess of the cost of reproduction. The fact that the company does not own the connection between the pipes in the streets and the buildings — such connections being the property of the individual property owners — does not militate against the proposition last stated, for who would care to buy, or at least give a large price for, a waterworks system without a single connection between the pipes in the streets and the buildings adjacent. Such a system would be a dead structure, rather than a living and going business. The additional value created by the fact of many connections with buildings, with actual supply and actual earnings, is not represented by the mere cost of making such connections. Such connections are not compulsory, but depend upon the will of the property owners, and are secured *32 only by efforts on the part of the owners of the waterworks, and inducements held out therefore. The city, by this purchase, steps into possession of a waterworks plant, — not merely a completed system for bringing water to the city, and distributing it through pipes placed in the streets, but a system already earning a large income by virtue of having secured connections between the pipes in the streets and a multitude of private buildings. It steps mto possession of a property which not only has the ability to earn, but is in fact earning. It should pay therefor not merely the value of a system which might be made to earn, but that of a system which does earn ” (italics supplied).
In addition to the foregoing emphasis on earning capacity and actual earnings — neither of which was established in the case at bar — there is another reason why the language of the cited cases does not help claimants here.
There is a vital distinction between the physical plant of a water, gas, electric or telephone company and the physical plant of a bus company. In the former cases, the service is produced by a fixed plant which requires physical connections with each of the customers served. Therefore, pipes or wires effectuating those connections are worth more when they are actually attached than they would be on the floor of a warehouse, and full value is not represented by their reproduction cost less depreciation.
In the case of a bus company, on the other hand, the service is produced by mobile vehicles which pick up their customers on the street. Therefore the full value of these vehicles would be represented by their reproduction cost less depreciation. The award here must be determined by the actualities, not by semantic similarities which do not fit the facts.
The city’s contention is equally untenable. As already indicated, claimants are entitled to have their property valued as “ property in use,” not as junk value (Denver v. Denver Union Water Co., 246 U. S. 178, supra). This means that full going value must be assigned to their tangible physical assets. These assets may not be devalued on the city’s premise that “ absent condemnation in March of 1962, claimants would have entered bankruptcy to avoid incurring further deficits.”
Just as claimants may not increase their value on the basis of a profitable operation which they never enjoyed, the city may not decrease the value on the basis of a bankruptcy which has not occurred. Neither may the city ask for a valuation predicated on reducing the fare to 10 cents or 5 cents, nor on its withdrawal of the substantial assistance given to claimants *33 by way of payment of school fares and reduction of franchise taxes.
We may assume that the city could take these actions at any time if that was done in the bona fide exercise of its governmental responsibilities. But it may not do so for the purpose of depressing the value of claimants’ properties in the projected or pending condemnation proceeding. (Matter of City of New York [Inwood Hill Park], 230 App. Div. 41, 43-44, 46-47, affd. 256 N. Y. 556; United States v. Meadow Brook Club, 239 F. 2d 41, 45 [2d Cir.], cert. den. 358 U. S. 921.)
Claimants’ physical assets must be taken at the value which “ a willing buyer would pay in cash to a willing seller.” If private buyers are not available because of the regulatory restrictions, it is what the city would probably pay if it were negotiating at arm’s length without the sanction of condemnation. “ Since a transfer brought about by eminent domain is not a voluntary exchange, this amount can be determined only by a guess, as well informed as possible, as to what the equivalent would probably have been had a voluntary exchange taken place ” (Kimball Laundry Co. v. United States, 338 U. S. 1, 6, supra).
In accordance with these principles, I have valued claimants’ garages at their reproduction cost new, less physical depreciation and an allowance for functional depreciation. This is not on the theory that they are specialties, because obviously they are not. (Matter of City of New York [Maxwell], 15 A D 2d 153, 171-172, supra; Matter of City of New York [Madison Houses], 17 A D 2d 317, 319-320.)
However, they are specially designed as bus garages, for which purpose they are worth more than their economic value as truck or ordinary garages. Since the city is continuing their use for the same more valuable purpose, it is only fair that they should pay what it would cost the city to erect comparable facilities, i.e., their reproduction cost new less physical depreciation. In such a situation, the value to condemnee and the value to condemnor is identical.
As was said in Kimball Laundry Co. v. United States (338 U. S. 1, 6, supra): ‘ ‘ But when the property is of a kind seldom exchanged, it has no * market price ’, and then recourse must be had to other means of ascertaining value, including even value to the owner as indicative of value to other potential owners enjoying the same rights” (italics supplied). Where improvements “ are custom built or expressly adopted to fit the premises, the rule of reproduction cost less depreciation is seemingly suited to the purpose by a somewhat similar principle *34 to that which has been applied in the assessment of real property in specialty cases ” (Marraro v. State of New York, 12 N Y 2d 285, 296).
Claimants object to any allowance for functional obsolescence, contending that this is embraced in the allowance for physical depreciation. It is true that there may be some duplication between the two, because as a building ages it loses some of its functional utility. However, the two items are separate and distinct. Physical depreciation refers to physical wear and tear; functional obsolescence refers to improvement in the arts' which may make a building less suitable for its intended purpose despite its excellent physical condition. See Matter of City of New York (Maxwell) (15 A D 2d 153, 175).
[Matter not of general interest omitted.]
■ REVENUE VEHICLES CLAIMANTS’ TESTIMONY
(1) FIFTH
The claimants’ expert witnesses with reference to this category of personal property were John F. Curtin and Paul W. Mayer. As previously indicated, the city condemned 844 buses and their appurtenant equipment. These buses are all Diesel-powered, manufactured by. General Motors Corporation, and built in the post-war period.
The appraisal is based upon replacement cost as of the condemnation date, with adjustment for depreciation and obsolescence on the bases of age, mileage use,. body and mechanical condition. Where the model was not being currently manufactured, the nearest comparable General Motors model, was used for the basis of replacement cost. The appraisal was on a bus-by-bus basis, and the condition factor was taken into account in each instance. After consideration of such elements as length of service, total miles operated, total miles operated since engine and transmission renewal or overhaul, respectively, time since last body overhaul, condition of body exterior and interior, and history of inspections by the company’s maintenance staff, claimants’ experts concluded that the probable life of these vehicles was 20 years. A formula was devised by Mr. Curtin which assumed a total mileage life of 500,000 miles for the 4506’s and 4507’s and 600,000 miles for the later models. In applying the factors of age and mileage life, claimants ’ experts determined the number of months the particular bus was in ■ service up to March, 1962, and related that to 240 months to determine the. percentage of age remaining at condemnation. *35 From the records of the companies they obtained the total mileage on the chassis and related that to 500,000 miles or ■600,000 miles, depending upon the model of the bus, and determined the percentage of mileage life remaining at condemnation. They then took an average of these two factors and reached a percentage condition of each bus. Percentage of remaining life thus derived was then applied to replacement costs to determine unadjusted depreciated value as of March, 1962.
To this depreciated value, plus or minus adjustments were made for engine and transmission, based on company records on mileage; minus adjustments were also made for body condition.
(2) SURFACE
The city condemned 1,024 buses and their appurtenant equipment. Ten hundred and seven of these buses were in service at the time of condemnation; 17 were retired prior to condemnation, 12 of which have been disposed of; the remaining 5 retired coaches were appraised at their salvage value. All of them were Diesel-powered vehicles, built in the post-war period by General Motors Corporation and Mack Trucks Inc.
The same method of appraisal was used as in the case of Fifth Avenue. In the case of Mack buses, however, since that company no longer manufactures buses, the nearest equivalent General Motors vehicle was used in deriving current replacement costs. A service life of 16 years was assigned to the buses, and a mileage life of 450,000 miles was used in the application of. the formula for deriving the percentage of remaining life.
city’s testimony
The city’s expert was Edward A. Roberts, a consulting engineer specializing in passenger transportation, with a broad experience in the actual management and operation of bus lines in New York for many years, in addition to his consulting practice.
He used an engineer-type bus appraisal, but did not use a reproduction cost similar to that established by Mr. Curtin. He claimed he could not justify the use of reproduction cost without some modification, since he was not producing in dollars an equivalent of an old bus but a vastly improved and superior bus. He made allowance for the increased cost of labor and materials in reproducing a GM 4506, for example, as a GM 4506 and not as a modern superior model, by averaging the actual cost of that bus with the cost of a “ new look ” bus.
The principal difference in the engineer-type - bus appraisals submitted by the parties lies in the factor of depreciation and *36 service life employed by the respective experts. Mr. Curtin found an age life of 20 years when averaged with a mileage life of 600,000 miles (500,000 for the GM 4506’s and 4507’s) would yield the most reliable service life for the purpose of determining value. Mr. Roberts adopted a 14-year service life.
In connection with estimating the service life of the buses, it is important to evaluate the maintenance practices of the operators of claimants’ fleets. The testimony disclosed that for a number of years Fifth had the reputation in the transit industry of a well-operated transit system. A similar reputation was never attributed to Surface. However, on the date of the condemnation and for a number of years prior thereto, both Fifth and Surface were beset with labor and financial difficulties which had reduced the efficiency of their maintenance systems to a point where they were definitely substandard (see testimony of witnesses Huffman, Schwartz, Krug, Feldman and Car rano).
The proof established that on the date of condemnation claimants’ fleets, by reason of poor maintenance and advanced age, were incapable of efficient operation.
The general experience of the industry, the specific experience of large transit systems as reflected in the studies and reports of the American Transit Association, and the experience in this city of the claimants and the Transit Authority support Mr. Roberts’ adoption of a 14-year service life for the buses.
This conclusion is corroborated by the fact that in June, 1961, Mr. Duggan, vice-president of claimants, reported to the board of directors that the age of the fleet was far above normal because of failure to replace buses at a normal rate and that on the basis of a 14-year economic life a reasonable replacement program would require 152 buses per annum. Mr. Duggan also reported to the City Bureau of Franchises that the use of buses 17 years old ‘ ‘ is extending the useful life beyond possible economic limits ”.
I conclude that the evidence supports the soundness of the appraisal practice adopted by Mr. Roberts, that is, to adjust the price of a used bus to reflect expenditures necessary to restore it to sound operating condition. It apparently is the method followed generally in the transit industry. Mr. Mayer, one of the claimants’ experts, testified he would never use the procedure employed by Mr. Curtin on adjustments if he were buying buses himself, and Mr. Curtin conceded that he had never made the adjustments he made here in any of his prior appraisals. Nor do I believe any prospective operator-purchaser of a bus fleet would employ such a method.
*37 I believe common sense and reason dictate that the age of a bus presupposes efficiency and proper maintenance during the span of life allotted to it. A new bus, never repaired or overhauled, would certainly never achieve its anticipated life term. Therefore, it follows, standard maintenance does not add to the life of a bus, whereas substandard maintenance reduces it. The time-life of a bus does not mean that at the expiration of its life period the bus is not capable of operation; it does mean that, despite all the repairs and maintenance it can be given, it cannot be operated economically on the required regular runs.'
I find the following values for the revenue vehicles:
Fifth................... $5,183,838
Surface ................ $4,518,349
[Matter not of general interest omitted.]
EXPERT TESTIMONY
The court, in determining the valuation of claimants’ tangible property condemned by the city, was compelled to weigh and evaluate the testimony of the numerous experts called by the respective parties. In but few instances was I able to fully adopt the proffered opinions, but I gave greater weight to the opinions of those experts whose testimony I found more convincing and to a greater degree supported by the facts upon which the opinions were based.
The following statement of Mr. Justice Steuer in Matter of City of New York (Maxwell) (15 A D 2d 153, 173, supra) is singularly applicable to this situation: “Likewise, the city’s claim that the court must have followed the claimant’s theory because the award exceeded the city’s estimates is baseless. This type of argument has the one advantage of respectable age. Forty years ago it was written: ‘ The mere fact that the court did not accept the testimony of the city’s experts as to value does not show that he was influenced by the fanciful and speculative plan presented by the claimants’ (Page, J. in Matter of City of New York [Inwood Hill Park], 197 App. Div. 431, 435 — an opinion notable not only for good law but for its literary allusions).”
CONSEQUENTIAL DAMAGES
As noted at the outset, claimants seek consequential damages of $19.5 millions in addition to the value of the tangible assets. These consist of $9.4 millions for pensions; $5.2 millions for insuring liability in regard to street railway tracks and for repaving the area; $4.3 millions for tort claim administration; and $0.6 million for workmen’s compensation and liabilities.
*38 There is a dispute as to whether claimants have any liability in respect of the street railway tracks and the appurtenant area.
While claimants admit that they are liable for payment of pensions to employees who have retired, they disclaim liability to those who have not retired. Nevertheless, the city introduced the testimony of Mr. Ain, an actuary, to establish the cost of such pensions to nonretired persons. This testimony is excluded as immaterial. The court does not express any opinion as to claimants’ liability respecting any of these items, because it is clear that even if they are liable, such liability is not an element of compensation in eminent domain.
Claimants disregard the fundamental distinction between severance damage, where only a portion of property is taken and compensation must be paid for the resultant damage done to the portion not taken, and consequential damages, where all of a property or business is taken and claim is made for compensation for subsisting contractual liabilities of the condemnee.
Severance damage (sometimes loosely called “ consequential ” damage) is compensable. That is the basis of the holding in Matter of Gillespie (Central Hudson Gas & Elec. Corp.) (263 App. Div. 175, affd. 288 N. Y. 514). The court held that result mandated by the Federal and State constitutional requirements of just compensation. But the court pointed out further (263 App. Div. 175, 177, 179) that the governing statute (title K of chapter 41 of the Administrative Code of the City of New York) specifically provided that (a) when real estate used for electric power lines, for example, was condemned by the Board of Water Supply, the electric corporation “ shall not directly or indirectly be subject to expense, loss or damage by reason of changing such route or location, but that such expense, loss or damage shall be borne by the city ” (§ K41-26.0), and “ where loss, damage or expense, direct or consequential, has resulted to * * * any electric corporation * * * the commissioners of appraisal * * * are hereby * * * directed to pass upon such claim and to make awards therefor as provided in this article ” (§ K41-13.0) (italics supplied). No such provisions are found in the condemnation statute here.
Consequential damages, however, as defined above, are not compensable. This distinction is pointed out in United States v. Miller (317 U. S. 369, 376, supra): “ If only a portion of a single tract is taken, the owner’s compensation for that taking includes any element of value arising out of the relation of the part taken to the entire tract. Such damage is often, though somewhat loosely, spoken of as severance damage. * * * As *39 respects other property of the owner consisting* of separate tracts adjoining that affected by the taking, the Constitution has never been construed as requiring payment of consequential damages ” (footnotes omitted).
In United States ex rel. T. V. A. v. Powelson (319 IT. S. 266, 281-282) the court said: “ This public project, to be sure, has frustrated respondent’s plan for the exploitation of its power of eminent domain. We may assume that that privilege was a thing of value and that this frustration of the plan means a loss to respondent. But our denial of compensation for that loss does not make this an exceptional case in the law of eminent domain. There are numerous business losses which result from condemnation of properties but which are not compensable under the Fifth Amendment. The point is well illustrated by two other lines of cases in this field. It is a well settled rule that while it is the owner’s loss, not the taker’s gain, which is the measure of compensation for the property taken (United States v. Miller, supra; United States v. Chandler-Dunbar Co., supra, p. 81; Boston Chamber of Commerce v. Boston, 217 U. S. 189, 195), not all losses suffered by the owner are compensable under the Fifth Amendment. In absence of a statutory mandate (United States v. Miller, supra, p. 376) the sovereign must pay only for what it takes, not for opportunities which the owner may lose. See Orgel, Valuation Under Eminent Domain (1936) § 71, § 73. On the one hand are such cases as Monongahela Navigation Co. v. United States, supra, where it was held that the United States had appropriated a going enterprise to its own ends and must make compensation accordingly. But it is well settled in this Court that, ‘ Frustration and appropriation are essentially different things. ’ Omnia Co. v. United States, supra, p. 513.” (Footnotes omitted.)
In City of Yonkers v. A. & J. Cianciulli, Inc. (117 N. V. S. 2d 792) the city took a permanent easement and a temporary easement in the condemnee’s lot, for the purpose of building a sewer. The commissioners made an award 1 ‘ for increased cost of construction of a building upon the lot in question and for loss of rental income of completed building claimed to have been sustained by owner because of delay in construction due to pendency of the sewer improvement and of this proceeding to condemn ” (p. 794). In disallowing that award, Eager, J., said (pp. 798-799): ‘ ‘ The contention of respondent that the awards for the increased cost of construction of its building and for loss of rental income is authorized by the decision in South Buffalo By. Co. v. Kirkover, 176 N. V. 301, 68 N. E. 366, is not believed to *40 be sound. This decision holds as a general proposition that the commissioners of appraisal are required to award the owner a sum that will fully indemnify him as to his proximate and consequential damages. In this connection, the consequential damages that may be the basis of an award in condemnation proceedings consist generally of the diminuation in value of the remainder of the owner’s property occasioned by the taking of a portion thereof or an easement therein and occasioned by the use to which the portion or easement taken is put by the condemnor. The consequential damages which may be awarded under a statute requiring just compensation for the property taken are the damages resulting from the direct taking to the remainder of the property of the owner. See, Van Aken v. State, 261 N. Y. 360, 185 N. E. 497; Coffey v. State, 291 N. Y. 494, 53 N. E. 2d 362; Culver Contracting Corp. v. Humphrey, 268 N. Y. 26, 196 N. E. 627. The alleged incidental losses sustained in the case at bar by the respondent owner in its building venture, did not result directly from the taking and use of the easements but are alleged to have been caused by a delay in the improvement and in the institution and maintenance of the condemnation proceedings. They are not deemed to be consequential damages directly flowing from the taking itself ” (italics in original).
In Omnia Co. v. United States (261 U. S. 502) the facts were as follows (p. 507):
“ The appellant, on May 19, 1917, by assignment, became the owner of a contract, by which it acquired the right to purchase a large quantity of steel plate from the Allegheny Steel Company, of Pittsburgh, at a price under the market. The contract was of great value and if carried out would have produced large profits.
‘ ‘ In October, 1917, before any deliveries had been made, the United States Government requisitioned the Steel Company’s entire production of steel plate for the year 1918, and directed that company not to comply with the terms of appellant’s contract, declaring that if an attempt was made to do so the entire plant of the Steel Company would be taken over and operated for the public use.”
In denying any recovery, the court said, per Sutherland, J. (pp. 513-i514):
< ‘ In the present case the effect of the requisition was to bring the contract to an end, not to keep it alive for the use of the Government.
“'The Government took over during the war railroads, steel mills, ship yards, telephone and telegraph lines, the capacity *41 output of factories and other producing activities. If appellant’s contention is sound the Grovernxnent thereby took and became liable to pay for an appalling number of existing contracts for future service or delivery, the performance of which its action made impossible. This is inadmissible. Frustration and appropriation are essentially different things.
“ There is nothing in Monongahela Navigation Co. v. United States, 148 U. S. 312, or in the other eases cited by appellant, which in any way conflicts with what we have said.
“ In the Monongahela Case the property which was taken was a lock and dam, built by the company, pursuant to the invitation of the United States and the State of Pennsylvania, the latter, in consideration, giving the company a franchise to exact tolls. The franchise, therefore, was not merely a contract in respect of the property taken, but was an integral part of it, and this Court (p. 329) said:
111 'So, before this property can be taken away from its owners, the whole value must be paid; and the value depends largely upon the productiveness of the property, the franchise to take tolls.’
“ The lock and dam constituted, in effect, a going concern, whose value was of course affected by what it would produce. Moreover, the case rested primarily upon the doctrine of estoppel, as this Court has in several cases since pointed out.”
See, also, United States v. Certain Lands in Borough of Manhattan (332 F. 2d 679, 336 F. 2d 1021 [2d Cir.]).
Claimants contend that they are entitled to these consequential damages because “ each represents expenses properly charged to revenues which, but for the condemnation, would have been received after March 21,1962, and since the City did not assume such expenses, claimants have sustained damage.” These items might properly be chargeable to revenues as a bookkeeping matter while a corporation continues in business, but they are not obligations which a purchaser is required to assume.
The city is paying all current operating expenses. It may not be charged with these deferred expenses attributable to obligations assumed by the condemnee prior to condemnation. The city would certainly not be liable to continue payments which claimants might be obligated to make under long-term employment contracts with executives whom the city did not continue in its employ, nor to fund a pension plan which claimants failed to fund during the employment period. There is no difference in principle between such obligations and the liabilities involved in these claims.
*42 An analogous problem was presented in Mullen Benevolent Corp. v. United States (290 U. S. 89). A municipality had issued to petitioner improvement district bonds to cover construction of sewers and sidewalks. The statute provided that if the original assessments on the adjoining properties were insufficient to meet the carrying charges on the bonds, the municipality must reassess in the necessary amount; if the municipality failed to collect such reassessments, the bondholders could do so. The United .States acquired all the real property in the improvement districts, some by purchase and some by condemnation. There was a deficiency in the bond payments, which would have been taken care of by the reassessments but for the acquisition of the real property by the United States. The court held that petitioner could not recover this deficiency from the Government, saying (pp. 94^95): “ The petitioner insists that the bonds are property and were in legal effect taken by the respondent. The argument is that the sole source of payment was a reassessment upon the lots in the improvement districts, and as the action of the respondent rendered such procedure vain, the United States as effectually destroyed the chose in action as if it had seized the instruments evidencing the right. But the bonds were not taken. At the date of acquisition by the G-overnment the real estate was subject to be assessed in the future for sundry taxes, amongst them taxes in the nature of reassessments for sewers and sidewalks. It is true these could not thereafter be levied on property which had passed to the United States, but this does not mean that the Government appropriated the right to assess them in futuro, nor that it took the benefit which might accrue to bondholders consequent on such future levies. By purchase of the lands the United States at most frustrated action by the city to replenish the assessment fund to which alone the bondholder must look for payment of his bonds. But this was not a taking of the bondholder’s property. Omnia Commercial Co. v. United States, 261 U. S. 502,”
Claimants argue that “ these items were operating expenses recoverable from the fare box and should follow the fare box into the City’s hands.” This disregards the stark fact that the fare box was progressively becoming less able to take care of even the current operating expenses, leaving nothing available for these expenses attributable to past operations.
As stated under “ good will ” (supra), for 1961, Fifth had a deficit of $300,000 after taxes, and Surface had a net income of $90,000 after taxes; for the past three years, the average net income after taxes was $27,000 for Fifth and $552,000 for Surface, The situation was getting even worse. It is not *43 apparent how such an emaciated fare box could pay out $19.5 millions of accumulated obligations. If the properties had not been condemned when they were, these obligations would have increased.
Claimants argue finally that ‘ ‘ the price which willing buyers and sellers would arrive at for the claimants’ assets would be raised if, as here, the liabilities were left with the seller.”
A willing buyer would pay no more than the fair value of the net assets which he gets. I have found the fair value of claimants’ properties to be $30,232,494. If a buyer took them free of liabilities, as here, that is all he would pay for them. If he took them subject to liabilities of $19.5 millions, he would pay only $10.7 millions therefor. No semantic legerdemain can alter that result.
During the trial certain testimony and exhibits were received subject to motions to strike. Except as heretofore otherwise indicated these motions are denied.
THE FOLLOWING ABE THE AWARDS:

CLAIM OF BANKERS TRUST COMPANY
Bankers Trust Company, acting as agent for itself and other banks, filed notices of claim and proofs of title showing a total amount of $2,689,999.90 as the balance of principal due on the date of vesting of title in the city, under certain conditional sale contracts covering 230 omnibuses taken in the proceeding. The city stipulated that appraisals made by and on behalf of the *44 city indicate that the aggregate value of the 230 omnibuses is at least that amount, such value being specifically allocated among the five proceedings involved. The claim is allowed in the amount of $2,689,999.90.
Interest on the awards should be computed at 4% (see opinion Botein, P. J., in Matter of City of New York [Maxwell], 15 A D 2d 153, 178-182).