William C. Hecht, Jr., J.
Upon objections to the tentative decree, claimants argue that they have proved that they are capable of profitable operations, and the city argues that it has established that claimants should be valued as a nonoperating transit system. These arguments, in effect, seek reconsideration of the legal conclusions in the opinion (see 46 Misc 2d 14).
I adhere to the conclusions expressed, for the reasons stated in the opinion. In view of its length, the reasoning will be briefly recapitulated here, even at the risk of some repetition.
Claimants seek, in addition to the value of their tangible assets, a value for good will, or for the moneys expended for training personnel, developing systems, and the like. The eases relied on by claimants indicate that, to establish such a value, they must show a history of profitable operations. (Kimball Laundry Co. v. United States, 338 U. S. 1, 16; Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 165; Monongahela Navigation Co. v. United States, 148 U. S. 312, 328; National Waterworks Co. v. Kansas City, 62 F. 853, 865 [Brewer, J.]; Banner Milling Co. v. State of New York, 240 N. Y. 533, 539.)
Such a history does not exist in this case. Claimants ’ average posttax income for the last three years was $579,000 —a return of less than 2% on the valuation found.
Their average posttax income for the last 10 years was not stated. But their average pretax income for that period was $3.2 millions.
In view of this concededly unimpressive earnings record, claimants have resorted to the argument that value should be assigned to the above-described intangibles because claimants are “ capable of profitable operation.” This novel argument is based on the language in Matter of City of New York (Sixth Ave. El. R. R.) (265 App. Div. 200, 206).
*736 As noted in the opinion, that case has no application here. The record there was barren of any proof of actual earnings, because Sixth Avenue had been operated as an integral part of the Manhattan Railway system. The court therefore remanded for proof as to whether Sixth Avenue was capable of profitable operation as a separate entity. This proof would depend in large part on Sixth Avenue’s actual earnings on a segregated basis.
Assuming arguendo that a value should be assigned to claimants’ intangibles, if they could prove capability of profitable operation in the future despite their dismal past, they have failed completely to discharge their burden of proving such capability. “ The actual experience of the Company is more convincing than tabulations of estimates. * * * Elaborate calculations which are at war with realities are of no avail” (Hughes, C. J., in Lindheimer v. Illinois Tel. Co., 292 U. S. 151, 163-164). “Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable, should be excluded from consideration”. (Butler, J., in Olson v. United States, 292 U. S. 246, 257).
Claimants tried to sIioav first that they could effectuate substantial economies in operation. I did not find this testimony credible. On the contrary, the proof indicates that their costs would increase because of the advanced age of their buses and the large amount of deferred maintenance.
Claimants then tried to show that they would obtain a higher fare. This effort failed for three reasons, any one of which would be sufficient.
First, claimants would lose a substantial portion of their patronage if they tried to increase their 15^-fare while the city’s rapid transit system retained that fare. Claimants have not proved a reasonable probability of an increase in the rapid transit fare. And even if there were such an increase now, it would have no bearing on the value of claimants’ business when the taking occurred in March, 1962, two and a half years earlier.
Secondly, even if we accept claimants’ argument that they could not be compelled to continue operations at a noncompensatory fare, the city could require them to surrender their franchise if they declined to adhere to the 15^-fare stipulated in the franchise.
Thirdly, even if claimants would have the right to retain their franchise despite an increased fare, the base on which such fare would be fixed would be the capital actually invested, *737 which is only $18.6 millions. Under no circumstances would they be entitled to a return on more than the present value of their real estate, and the sound value of their garages, buses and fixtures. (Matter of New York Tel. Co. v. Public Serv. Comm., 309 N. Y. 569.) I have found that value to be $30.2 millions, the amount of the award.
As to the city’s contention: We assume arguendo that if the city discontinued its payment of school fares, and insisted on full franchise taxes and adherence to the 15 ^-fare, claimants might be driven into bankruptcy and the city might then be able to buy their properties at the valuation applicable to a nonoperating transit system. But such a course of conduct would offend all sense of fair-dealing. And it would flout the legislative finding which the city sought and on the basis of which it has exercised the instant condemnation — that “ the continued uninterrupted adequate, efficient and safé operation of omnibus lines [in such cities] is essential to the health, welfare and safety of the inhabitants of such cities ” (L. 1962, ch. 161; italics supplied).
The plain fact is that the city was able to walk in on the date of condemnation, and continued to operate this transit system without interruption, just as it had been operated up to condemnation. It is unrealistic to say that the subject of condemnation was not an operating transit system. The fact that the buses were undermaintained was given effect in the valuation assigned to them.
Claimants’ objections to specific items of valuation will now be considered.
1. One of the objections made by claimants to the court’s award for real estate is based on the failure of the court to give a 15% increment for additional frontages for Damage Parcels 2 and 4. Examination of the record indicates that both these parcels have three frontages. The court allowed a 10% increment for Damage Parcels 1 and 16 which have two frontages, and a 15% increment for Damage Parcel 6 which has three frontages. Accordingly, this objection is sustained and the awards for Damage Parcels 2 and 4 are modified to the extent of allowing increments of 15% instead of 10%. The awards are increased to $2,114,089 for Damage Parcel 2 and $670,082 for Damage Parcel 4.
2. Claimants point out that two of their garages were found to have an economic value higher than their sound value, and urge that they are entitled to such higher valuation for these two garages. But this would be inconsistent with the going concern concept which I accepted in allowing the aggregate *738 award for the 12 garages on a sound value, which was much higher than the aggregate award would have been on an economic basis. Claimants having received the benefit of this higher aggregate award on the premise that they were taken over as a going concern, they cannot now claim the higher valuation which would apply to 2 of the 12 parcels only if the going concern were dismembered by the sale of these 2 garages.
3. Claimants contend that an allowance for physical wear and tear necessarily includes an allowance for functional obsolescence. But the two items are completely independent.
Let us assume two garages, A and B, both of the same age and both of substantially the same size and construction. However, A had been built as a bus garage, while B had been built as a trolley barn but had subsequently been converted to a bus garage. Taking reproduction cost less physical wear and tear alone, B would show at least as high a value as A, perhaps even higher because of the additional cost involved in the conversion. Yet obviously A is the more valuable property for an operating bus company.
This self-evident result is reached by deducting little if anything for functional obsolescence in A’s case, while deducting a much larger amount in B’s case because it is so much less suitable for the purpose for which it is intended. Even in the case of A, which was originally built for the storage and servicing of buses, changes in the size and design of buses might create needs for their storage and servicing for which A would not have the same suitability as a newly constructed garage. • This unsuitability would not be taken care of by a deduction for physical wear and tear; it would have to be reflected in a deduction for functional obsolescence.
4. Claimants object that I used a 14-year life for the buses, thus adopting in toto the testimony of the city’s expert, instead of arriving at a life somewhere between his opinion and the 20-year life testified to by claimants’ expert. Where a court does not wholly agree with either expert, the valuation would naturally fall somewhere between both opinions. But in this case, my observation of the witnesses led to the conclusion that the city’s expert had reached the correct result, and that claimants’ expert was wide of the mark. Under such circumstances, there is no basis for adopting a compromise figure.
The allowance of a 14-year life by the city’s expert Roberts is corroborated by other persuasive evidence in the record. Exhibit 228 shows that, of the 19,448 buses owned at the end of 1961, by the nation’s 56 largest transit systems reporting *739 to the American Transit Association (excluding claimants), only 6% had survived to their 15th year or beyond. The percentage for the 5 largest systems was: Chicago Transit Authority, 10% of 2,604 buses; Public Service Co-ordinated Transport (N. J.), 1% of 2,306 buses; New York City Transit Authority, none of 2,170 buses; Philadelphia Transportation Co., 3% of 1,290 buses; Detroit Department of Street Railways, 3% of 929 buses. By way of contrast, 25% of claimants’ 2,113 buses were 15 or more years old.
The fact that these 532 buses are still in operation does not establish that a 14-year life allowance is too short. The bus companies have found that it is more economical to retire buses after 14 years, rather than to subject themselves to the substantial additional costs of maintenance and operation of the superannuated buses.
5. Claimants object that the salvage value allowed for the buses over 14 years old does not give as much value to the motors and other usable parts as I assigned to similar items included in the appraisal of fixtures and personal property. The latter items were specifically valued by competent experts, whose testimony as to their condition and usableness I found credible. The parts in the buses were not specifically valued, and there was no way to determine their condition or future utility. In the light of all the testimony, I accepted Mr. Boberts ’ opinion of their salvage value. This opinion finds support in the salvage realized by claimants on 45 buses retired in 1960.
6. I find no reason to depart from my original conclusion with respect to the allowance made for depreciation of the personal property other than buses.
7. The opinion stated that the city may not be charged with deferred expenses attributable to obligations assumed by the condemnee prior to condemnation. Claimants contend that this should not apply to their possible liability in respect of the street railway tracks, since such liability (if any) will not arise until they are required to remove the tracks.
No opinion is expressed here as to whether Surface is or will be held liable for removal of the tracks, or for injuries resulting from presence of the rails. But if such liability is ultimately imposed, the basis of it would be the agreement made by Surface when it exchanged its trolley franchises for its bus franchises. This is a pre-existing liability on an exact parity with claimants’ liabilities for pensions, tort claim administration, and workmen’s compensation and liabilities. It is not compensable for the reasons stated in the opinion.